Donald M. TANNER, Betsy Wheeler and
Susan Roberts, Plaintiffs,

v.

LLOYD CORPORATION, Ltd.,
Defendant.

Civ. No. 69-127.

United States District Court
D. Oregon.

Jan. 15, 1970.

Carl R. Neil, Portland, Or., for plaintiffs.

George Black, Jr., Milton C. Lankton, Robert J. Miller, Black, Kendall, Tremaine, Boothe & Higgins, Portland, Or., for defendant.

OPINION

SOLOMON, Chief Judge:

Donald Tanner, Betsy Wheeler and Susan Roberts brought this action under 42 U.S.C. § 1983 [1] and 28 U.S.C. § 2201 [2] for a judgment declaring that they have the right to distribute handbills in the Mall of Lloyd Center, a shopping center owned by Lloyd Corporation, Ltd. (Cor-

---

1. "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."

2. "In a case of actual controversy within its jurisdiction, * * * any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought."

poration). Plaintiffs also seek to enjoin the Corporation from interfering with that right. Plaintiffs allege jurisdiction under 28 U.S.C. § 1343.[3]

With a few minor exceptions, the parties agree on the facts, but not on the conclusions to be drawn from those facts.

Lloyd Center is a large, modern retail shopping center in Portland, Oregon. The Center covers about 50 acres, including about 20 acres of open and covered parking facilities for more than 1,000 automobiles. It has a perimeter of almost one and one-half miles. The Center is bounded by four public streets— Broadway Street, Lloyd Boulevard, and Ninth and Sixteenth Avenues. It is crossed by Weidler, Halsey, Multnomah, and Holladay Streets running east to west and by Fifteenth Avenue running north to south. At least six other streets run partly into or around the Center.

The streets in and surrounding the Center are publicly owned and have adjacent public sidewalks. The Corporation owns all other land within the Center, and has more than 60 commercial tenants, including small shops and major department stores.

At a few places within the Center, the Corporation has embedded small signs in the sidewalk,[4] which state:

"NOTICE—Areas In Lloyd Center Used By The Public Are Not Public Ways But Are For The Use Of Lloyd Center Tenants And The Public Transacting Business With Them. Permission To Use Said Areas May Be Revoked At Any Time. Lloyd Corporation, Ltd."

The principal portion of the Center is occupied by a unified shopping area, called the "Mall," which covers about 25 acres and has a perimeter of about .8 miles. It is not crossed by public streets. The Mall is a multi-level complex of buildings, parking facilities, sub-malls, sidewalks, stairways, elevators, escalators, bridges, and gardens, and contains a skating rink, statues, murals, benches, directories, information booths, and other facilities designed to attract visitors and make them comfortable.

Pedestrians have access to some of the Mall stores through entrances on both public and Mall sidewalks, while they have access to other stores only from the interior of the Mall. Automobiles enter the Mall from the surrounding public streets.

The Mall is open to the general public. In addition, the Corporation invites groups to conduct activities there, if those activities will promote "customer motivation." It has invited schools to hold football rallies, service organizations to hold Veterans Day ceremonies, and presidential candidates to give speeches during election years.

The Corporation also permits groups which it believes to be worthy to use the Mall even though they do not add to "customer motivation." It permits the American Legion to sell "buddy" poppies at least once each year, and every year before Christmas, it permits bellringers for the Salvation Army and Volunteers of America to set up kettles and solicit contributions.

The Corporation prohibits other groups from using the Center for their own purposes. It denied the March of Dimes and Hadassah, a national Zionist

---

3. "The district courts shall have original jurisdiction of any civil action authorized by law to be commenced by any person: * * * (3) To redress the deprivation, under color of any State law, statute, ordinance, regulation, custom or usage, of any right, privilege or immunity secured by the Constitution of the United States or by any Act of Congress providing for equal rights of citizens or of all persons within the jurisdiction of the United States * * *."

4. Plaintiffs' counsel went to the Center and was unable to find these signs. Mr. Horn, the manager of the Center, testified that he ordered the signs installed several years ago and that he assumed they were still there although he did not know exactly where they were.

women's service organization, the opportunity to solicit contributions and denied Governor Tom McCall the opportunity to make a political speech. As part of this policy, the Corporation prohibits the distribution of handbills within the Mall.

The Corporation enforces its rules through twelve commissioned special police officers of the City of Portland, whom it employs as Security Guards. The Guards have full police authority, carry guns, and wear uniforms similar to those worn by the Portland Police.

On November 14, 1968, Plaintiffs entered the Mall and distributed handbill invitations to a meeting of the "Resistance Community" to protest the draft and the Vietnam War. The distribution was quiet, orderly, and did not interfere with the Mall selling activities, and there was no littering. Nevertheless, the Security Guards told Plaintiffs that they would be arrested unless they stopped distributing the handbills within the Mall. The Guards suggested that Plaintiffs distribute their literature on the public streets and sidewalks. Plaintiffs left the Mall to avoid arrest [5] and subsequently brought this action.

The Corporation raises a number of preliminary issues of fact and law.

1. The Corporation asserts that the Mall is not open to the general public; that it is similar to an office building; and that the signs in the sidewalk inform visitors that they are permitted to enter the Mall only for the purpose of transacting business.

In 1954, when the Corporation acquired land for the Center, the City of Portland vacated about eight acres of public streets for use by the Corporation. The ordinance by which the City vacated the streets recited that the City intended that the Corporation should use the land for the construction of "a general retail business district." In spite of this ordinance, the Corporation now asserts that the Mall is like an office building rather than like a public business district. Although the Mall's multi-level design is not yet common among modern shopping centers, the Mall is a prototype for future city planning. Its parking facilities and sidewalks serve the same purpose as streets and sidewalks of a public business district. I find that the Mall is the functional equivalent of a public business district. *Cf.* Wolin v. Port of New York Authority, 392 F.2d 83 (2d Cir. 1968).

The Corporation invites everyone to the Center and permits anyone to enter the Mall. It hopes that visitors who go there without the intention of buying will change their minds while visiting at the Center or while windowshopping or browsing. The few "private property" signs embedded in the sidewalk are small. Few people are likely to notice them. The Center's manager did not even know where they were. Although the parking facilities are closed during the late night and early morning hours, the walkways in the Mall are open to pedestrian traffic 24 hours a day. I find that the Mall is open to the general public.

2. The Corporation asserts that the distribution of handbills interferes with Mall selling activities. It is true that under some circumstances, conduct accompanying the distribution of handbills could interfere with Mall business. Here, however, Plaintiffs' sole activity

---

5. Plaintiffs testified that they were told that they *would* be arrested, and that they left to avoid arrest. The Corporation asserts that the Guards said that they *could* call regular city police officers to arrest Plaintiffs. The Agreed Facts in the Pretrial Order state that the Guards told Plaintiffs they *could* be arrested. According to the testimony of the Corporation, the Guards have arrested persons on the Mall for other offenses, but have never arrested anyone for distributing handbills and did not intend to arrest Plaintiffs here. The Corporation refuses to promise that it will not arrest Plaintiffs if they return to distribute handbills.

In my view, the Guards caused Plaintiffs to believe that the Guards, in their official capacity as policemen, would arrest Plaintiffs or would cause their arrest.

was the distribution of handbills to those who were willing to take them. There was no littering or disturbance. I find that Plaintiffs were engaged in the pure expression of political beliefs. *Cf.* Wolin v. Port of New York Authority, *supra.* Plaintiffs' activities affected Mall business only to the extent that the expression of beliefs interferes with customers' motivation to buy.

3. The Corporation contends that Plaintiffs can distribute handbills just as effectively from the public streets and sidewalks as from the interior of the Mall. It would be difficult and perhaps dangerous for Plaintiffs to distribute their handbills from the public sidewalks to customers entering the Mall. Many customers do not use the public sidewalks and streets except when entering the Mall by automobile. In addition, it would be much more difficult to reach pedestrians on the public sidewalks than to reach them in parts of the Mall interior through which most customers pass. I find that Plaintiffs cannot distribute handbills as effectively from the public streets and sidewalks as they can from the Mall interior.

4. The Corporation's contention that its Guards were merely exercising their First Amendment rights when they told Plaintiffs to leave or be arrested is frivolous.

5. The Corporation contends that it relied solely on the Oregon trespass statute when it ordered Plaintiffs to leave. It argues that this Court should abstain from deciding this case until the Oregon courts have decided whether the statute applies to Plaintiffs.[6] In the alternative, the Corporation argues that a three-judge court must hear this case because it is an action to declare the Oregon trespass statute unconstitutional. The Corporation does not, however, concede that Plaintiffs have the right to distribute handbills within the Mall if the Oregon statute is inapplicable. It claims the private property right under the Fifth Amendment to exclude Plaintiffs regardless of the statute. The issue here, therefore, is not whether the Oregon statute is constitutional. It is whether the Fifth Amendment gives the Corporation the right to prohibit Plaintiffs' activities.

6. The Corporation asserts that Plaintiffs failed to state a cause of action under 42 U.S.C. § 1983 because the Corporation did not act under color of state law. The Corporation's Security Guards had full police authority from the City of Portland and exercised that authority to cause Plaintiffs to leave the Mall. This constituted action under color of state law. See Williams v. United States, 341 U.S. 97, 71 S.Ct. 576, 95 L. Ed. 774 (1951); DeCarlo v. Joseph Horne & Co., 251 F.Supp. 935 (W.D.Pa. 1966).

On the merits of this case, I find that the Corporation's rule prohibiting the distribution of handbills within the Mall violates Plaintiffs' First Amendment rights. I do not believe the Corporation may decide what groups may distribute literature within the Mall. Neither do I believe the Corporation may prohibit all distribution of handbills.

In Marsh v. Alabama, 326 U.S. 501, 66 S.Ct. 276, 90 L.Ed. 265 (1946), Marsh, a Jehovah's Witness, was convicted of trespass because she distributed religious literature in the shopping area of a company town after the owner warned her to leave. The town, Chickasaw, Alabama, had all the characteristics of a normal American town. Its streets and sidewalks, though privately owned, connected to publicly owned streets and were open to the general public.

Alabama argued that the owner had absolute dominion over the use of his property and that the owner had the right to bar the distribution of all literature within the town or to decide which

---

6. The Corporation admits that no action which would yield such a decision is pending in the Oregon courts.

literature could be distributed. The Court rejected this argument:

> "Ownership does not always mean absolute dominion. The more an owner, for his advantage, opens up his property for use by the public in general, the more do his rights become circumscribed by the statutory and constitutional rights of those who use it." 326 U.S. at 506, 66 S.Ct. at 278.

For citizens to participate in this nation's government, the Court said, it is necessary that the public be informed and that its information be uncensored. Balancing Marsh's First Amendment rights against the owner's property rights, the Court held that Marsh's rights occupied a "preferred position" and weighed heavier than the owner's rights. The Court therefore reversed Marsh's conviction.

Plaintiffs' distribution of handbills here was identical to the distribution of literature in *Marsh.* Here also, the owner claims the right to bar the distribution of literature or to select which literature may be distributed. The sole distinction between this case and *Marsh* is that this case involves a shopping center whereas *Marsh* involved a town. I do not believe that distinction should cause a different result.

In Amalgamated Food Employees Union v. Logan Valley Plaza, Inc., 391 U.S. 308, 88 S.Ct. 1601, 20 L.Ed.2d 603 (1968), the Supreme Court expressly extended *Marsh* to shopping centers. The Logan Valley Mall was bordered on two sides by public streets and had a perimeter of 1.1 miles and space for at least 17 commercial tenants. It was open to the general public and had sidewalks, parking lots, and roadways for automobiles. The owner sought to enjoin a union from picketing a store within the shopping center.

The owner argued that *Marsh* involved an entire town and therefore was not applicable to a shopping center. The Supreme Court did not agree:

> "We see no reason why access to a business district in a company town

for the purpose of exercising First Amendment rights should be constitutionally required, while access for the same purpose to property functioning as a business district should be limited simply because the property surrounding the 'business district' is not under the same ownership." 391 U.S. at 319, 88 S.Ct. at 1608.

It is true that the Court in *Logan Valley* left open the question whether the owner could bar picketing which was not directly related to the use of the center. Here, Plaintiffs' distribution of handbills was pure speech. I believe that there is no reason, as the Court said in *Logan Valley*, to distinguish a company town from a shopping center which functions as a business district.

■ If *Logan Valley* does not go as far as I suggest, the First Amendment does. In my view, an owner who opens his land to the general public for business purposes, to the extent that the land becomes the functional equivalent of a public business district, gives up the right to prohibit the distribution of literature or to decide which literature may be distributed. If this were not true, the public need for uncensored information, on which *Marsh* was based, could be frustrated.

After Plaintiffs brought this action, the Corporation, in an attempt to avoid an adjudication on the merits, asserted that Plaintiffs' distribution of handbills on November 14 violated the Selective Service laws. I do not believe this contention is relevant to this controversy. The evidence shows that the Guards were enforcing their employer's policy prohibiting individuals from distributing handbills unless they received prior approval by the Corporation. There is no evidence that the Guards thought Plaintiffs' activities were illegal. If they did, it would be unlikely that they would have suggested that Plaintiffs continue their activities on the public sidewalks. If the Corporation wishes to prevent speech which it believes is ille-

gal, it should do so through arrest and prosecution in the normal course, not through the prohibition of all speech. Wolin v. Port of New York Authority, *supra*, 392 F.2d at 91 n. 11.

Plaintiffs are entitled to a judgment declaring that they have the right to distribute handbills within the Lloyd Center Mall. They are also entitled to an injunction restraining Lloyd Corporation from interfering with that right.

This opinion shall constitute findings of fact and conclusions of law in accordance with Rule 52(a) Fed.R.Civ.P.