[No. 868-1.    Division One—Panel 2.    December 18, 1970.]

MARGUERITE SUTHERLAND *et al., Petitioners,* v. SOUTHCENTER SHOPPING CENTER, INC., *et al., Respondents.*

834

*Schroeter, Jackson, Goldmark & Bender, Roger M. Leed, Miller, Howell & Watson,* and *John R. Miller,* for petitioners.

*Shidler, McBroom & Gates* and *George W. McBroom,* for respondents.

*Bogle, Gates, Dobrin, Wakefield & Long, Dustin C. Mc-Creary,* and *Allan H. Toole,* amici curiae.

UTTER, J.—The Washington Environmental Council (Council) appeals from an order by the King County Superior Court, denying a request for a temporary or permanent injunction against two large shopping centers, Southcenter

Shopping Center, Inc. (Southcenter) and Northgate Shopping Centers, Inc. (Northgate).

The case presents the issue of whether an unconsented invasion of the property rights of owners of land to solicit signatures for an initiative is protected by the first and fourteenth amendments of the United States Constitution and by article 1, sections 4, 5, and 9 of the Washington State Constitution. We hold that it is, subject to reasonable regulation, and reverse the order of the trial court denying a permanent injunction.

The Council is the sponsor of an initiative to the legislature dealing with shoreland protection. It requires over 100,000 signatures of registered voters by December 31, 1970, if the measure is to be certified to the January, 1971 session of the legislature.

Southcenter and Northgate are large shopping centers, each bounded by public streets and having on their perimeter large, free parking areas owned by the respective corporations. They are each built entirely on private land and all areas within the center, such as roadways, parking areas, sidewalks, and malls not leased exclusively to tenants, are common areas under corporation supervision and control. The centers maintain a private force of security officers who are deputized by the local law enforcement agencies.

Northgate contains 1,241,000 square feet of building area, has 109 tenants, 6,897 parking spaces and an anticipated sales volume of $70,000,000 in 1970. Southcenter contains 1,606,200 square feet of building area, with 115 tenants, 6,729 parking spaces, and an anticipated 1970 volume of $74,000,000. The centers are open to the public 7 days a week and on five evenings as well. The only significant physical difference between the two is the central walkway area called the "mall." Northgate's mall is covered, but not enclosed; Southcenter has an enclosed, air-conditioned mall.

The presentation of evidence to the trial court was by affidavit, consistent with the procedure for determining the initial issuance of a temporary injunction. The parties

agreed to the determination of all issues by the trial court on the basis of the affidavits, and the trial court then entered findings of fact, conclusions of law, and its final order denying both the temporary and permanent injunctions.

The court found the centers had requested the Council and those soliciting for them to refrain from soliciting signatures, that the solicitation of signatures was not consented to, and that denial was neither selective nor discriminatory with regard to the centers' action towards the petitioning solicitors. It further found that the solicitations had no direct relationship to the business operations of the center. The trial court indicated in its oral opinion, which we may consider, that the use of the shopping centers was the most effective way to obtain signatures. *Saddler v. State,* 66 Wn.2d 215, 401 P.2d 848 (1965).

■ We believe the activities engaged in by the solicitors for the Council are within the protection of the first amendment to the United States Constitution. This is assumed without discussion in *Diamond v. Bland,* 3 Cal. 3d 653, 477 P.2d 733 (1970). The process of informing the public of the subject matter of the initiative, whether by verbal communication or printed material, is pure speech. The balance of the process requiring the obtaining of signatures and qualifying the signer involves nonspeech elements. The conduct may, therefore, be subjected to controls which would not be permitted if it were pure speech. *Cox v. Louisiana,* 379 U.S. 559, 13 L. Ed. 2d 487, 85 S. Ct. 476 (1965).

■ The action of the centers involved "state action" within the meaning of the Fourteenth Amendment, through the centers' use of deputized security personnel and the request to petitioners to leave the premises as a necessary prelude to establishing an action for criminal trespass. *Tanner v. Lloyd Corp.,* 308 F. Supp. 128 (D. Ore. 1970); RCW 9.83.080. The existence of "state action" is not seriously questioned by the centers.

We are unaware of any federal court decisions dealing with the precise question of the extent to which the First

and Fourteenth Amendments protect the Council's right to solicit signatures for initiatives on the private property of the centers. There are cases dealing, however, with related problems of application of the First Amendment to such activities as picketing and distribution of handbills on non-public property for political or religious purposes. *Amalgamated Food Employees Union Local 590 v. Logan Valley Plaza, Inc.,* 391 U.S. 308, 20 L. Ed. 2d 603, 88 S. Ct. 1601 (1968); *Marsh v. Alabama,* 326 U.S. 501, 90 L. Ed. 265, 66 S. Ct. 276 (1946); *Tanner v. Lloyd Corp., supra;* and *Wolin v. Port of New York Authority,* 268 F. Supp. 855 (S.D.N.Y. 1967). State decisions dealing with similar problems are: *In re Lane,* 79 Cal. Rptr. 729, 457 P.2d 561 (1969); *State v. Miller,* 280 Minn. 566, 159 N.W.2d 895 (1968); *Blue Ridge Shopping Center, Inc. v. Schleininger,* 432 S.W.2d 610 (Kansas City Ct. App. 1968); *Schwartz-Torrance Inv. Corp. v. Bakery & Confectionery Workers' Union, Local 31,* 61 Cal. 2d 766, 40 Cal. Rptr. 233, 394 P.2d 921 (1964); and *Freeman v. Retail Clerks Union Local 1207,* 58 Wn.2d 426, 363 P.2d 803 (1961). The court, in *Diamond v. Bland, supra,* had the same question before it that we now have.

In *Marsh,* the Supreme Court first held that under some circumstances, property privately owned may, at least for First Amendment purposes, be treated as if it were publicly held. The town in question was a true company town. The residential buildings, streets, sewer system, and business block were owned by a shipbuilding corporation. The business block was used as the regular shopping center by the residents and the use by the public of the roads and sidewalks was as unfettered as if it had been a normal business district. The only distinguishing feature was that title to the property was privately held. Notices in the town indicated solicitation was forbidden without written permission. When a nonresident Jehovah's Witness requested permission to distribute religious literature, she was refused, and when she persisted in distributing her material, she was arrested under the authority of a criminal trespass statute.

It was held that the statute was unconstitutionally ap-

plied. The court stated that, for First Amendment purposes, it was irrelevant whether the street was owned by the municipality or the corporation and the public, in each case, has an identical interest in assuring that there be a forum for free speech and the exercise of religion. In balancing the constitutionally protected property rights of the owners against the First Amendment rights of the people, the latter must prevail for "the First Amendment 'lies at the foundation of free government by free men.' " In short, the fact that the property was privately owned was deemed insufficient justification for the state to permit the corporate owner to restrict fundamental liberties.[1]

*Logan Valley* was the next and last expression by the Supreme Court on this question. There the question before the court was whether peaceful picketing of a business

---

[1]The court stated in *Marsh v. Alabama*, 326 U.S. 501, 90 L. Ed. 265, 66 S. Ct. 276 (1946): "Whether a corporation or a municipality owns or possesses the town the public in either case has an identical interest in the functioning of the community in such manner that the channels of communication remain free. . . . The 'business block' serves as the community shopping center and is freely accessible and open to the people in the area and those passing through. The managers appointed by the corporation cannot curtail the liberty of press and religion of these people consistently with the purposes of the Constitutional guarantees, and a state statute, as the one here involved, which enforces such action by criminally punishing those who attempt to distribute religious literature clearly violates the First and Fourteenth Amendments to the Constitution.
". . .

"When we balance the Constitutional rights of owners of property against those of the people to enjoy freedom of press and religion, as we must here, we remain mindful of the fact that the latter occupy a preferred position. As we have stated before, the right to exercise the liberties safeguarded by the First Amendment 'lies at the foundation of free government by free men' and we must in all cases 'weigh the circumstances and . . . appraise the . . . reasons . . . in support of the regulation . . . of the rights.' . . . In our view the circumstance that the property rights to the premises where the deprivation of liberty, here involved, took place, were held by others than the public, is not sufficient to justify the State's permitting a corporation to govern a community of citizens so as to restrict their fundamental liberties and the enforcement of such restraint by the application of a state statute." (Footnote omitted.)

enterprise located within a shopping center could be enjoined on the ground that it constituted an unconsented invasion of the property rights of the land owners. The physical location of the Logan Valley center was at the intersection of two public roads, with five entrances from these roads to the center.

Other than these entrances, the shopping center was separated from the road by earthen berms and buildings. The Weis Market, the object of the picketing, and other buildings in the center were separated, in turn, from the berms by extensive parking lots owned by the shopping center.

The Weis Market consisted of an enclosed supermarket building with an open but covered porch along the front of the building for customers to walk under. Within the porch was a 5-foot-wide and 41-foot-long parcel pickup zone used as a temporary parking place for loading purchases into customers' cars by Weis employees. The picketing of the Weis store was carried out almost entirely in the parcel pickup area and the parking lot immediately adjacent. The court noted that although some congestion of the parcel pickup area occurred, the congestion was sporadic and infrequent and the picketing was peaceful at all times.

The decree of the Pennsylvania courts limited picketing to the area outside the local mall premises. The court noted, among other things, that this made the task of distributing handbills vastly more difficult than if petitioners had been permitted to pass them out within the mall, and further, that the restraints placed on the union substantially hindered the communication of ideas to patrons of Weis.

The unique character of the pedestrian walkways in the shopping center did not deter the court in *Amalgamated Food Employees Union Local 590 v. Logan Valley Plaza, Inc.*, 391 U.S. 308, 20 L. Ed. 2d 603, 88 S. Ct. 1601 (1968), from concluding that the owner had no absolute right to forbid the exercise of the First Amendment right of peaceful picketing there. The court developed the rationale for its holding by first holding peaceful picketing carried on in a location open generally to the public is, absent other

factors involving the purpose or the manner of picketing, protected by the First Amendment. The court also held that if shopping centers were not privately owned, a city could not forbid peaceful picketing on the sole ground that they held title to the streets and sidewalks, inasmuch as the streets and sidewalks were historically the forum for the exercise of First Amendment rights. The court emphasized the right to regulate the exercise of rights, like handbilling and picketing, did not imply that the traditional concepts of ownership carried with it the absolute right to forbid hand-billing and picketing.[2]

The court noted the similarities between the business block in *Marsh v. Alabama,* 326 U.S. 501, 90 L. Ed. 265, 66 S. Ct. 276 (1946) and the Logan Valley shopping center were striking, and concluded the Logan Valley shopping center was the functional equivalent of the business district in *Marsh.*

The court examined in some detail, the physical and

---

[2]The court noted in *Amalgamated Food Employees Union Local 590 v. Logan Valley Plaza, Inc.,* 391 U.S. 308, 20 L. Ed. 2d 603, 88 S. Ct. 1601 (1968): "[I]f the shopping center premises were not privately owned but instead constituted the business area of a municipality, which they to a large extent resemble, petitioners could not be barred from exercising their First Amendment rights there on the sole ground that title to the property was in the municipality. *Lovell v. Griffin,* 303 U.S. 444 (1938); *Hague v. CIO,* 307 U.S. 496 (1939); *Schneider v. State,* 308 U.S. 147 (1939); *Jamison v. Texas,* 318 U.S. 413 (1943). The essence of those opinions is that streets, sidewalks, parks, and other similar public places are so historically associated with the exercise of First Amendment rights that access to them for the purpose of exercising such rights cannot constitutionally be denied broadly and absolutely.

"The fact that *Lovell, Schneider,* and *Jamison* were concerned with handbilling rather than picketing is immaterial so far as the question is solely one of right of access for the purpose of expression of views. Handbilling, like picketing, involves conduct other than speech, namely, the physical presence of the person distributing leaflets on municipal property. . . . That the manner in which handbilling, or picketing, is carried out may be regulated does not mean that either can be barred under all circumstances on publicly owned property simply by recourse to traditional concepts of property law concerning the incidents of ownership of real property."

functional similarities between the Logan Valley center and the business district in *Marsh*[3] and narrowed its precise holding, stating:

All we decide here is that because the shopping center serves as the community business block "and is freely accessible and open to the people in the area and those passing through," *Marsh v. Alabama,* 326 U. S., at 508, the State may not delegate the power, through the use of its trespass laws, wholly to exclude those members of the public wishing to exercise their First Amendment rights on the premises in a manner and for a purpose generally consonant with the use to which the property is actually put.[9]

[9]The picketing carried on by petitioners was directed specifically at patrons of the Weis Market located within the shopping center and the message sought to be conveyed to the public concerned the manner in which that particular market was being operated. We are, therefore, not called upon to consider whether respondents' property rights could, consistently with the First Amendment, justify a bar on picketing which was not thus directly

---

[3]The court stated in *Amalgamated Food Employees Union Local 590 v. Logan Valley Plaza, Inc.,* 391 U.S. 308, 20 L. Ed. 2d 603, 88 S. Ct. 1601 (1968): "We see no reason why access to a business district in a company town for the purpose of exercising First Amendment rights should be constitutionally required, while access for the same purpose to property functioning as a business district should be limited simply because the property surrounding the 'business district' is not under the same ownership. Here the roadways provided for vehicular movement within the mall and the sidewalks leading from building to building are the functional equivalents of the streets and sidewalks of a normal municipal business district. The shopping center premises are open to the public to the same extent as the commercial center of a normal town. So far as can be determined, the main distinction in practice between use by the public of the Logan Valley Mall and of any other business district, were the decisions of the state courts to stand, would be that those members of the general public who sought to use the mall premises in a manner contrary to the wishes of the respondents could be prevented from so doing.

"Such a power on the part of respondents would be, of course, part and parcel of the rights traditionally associated with ownership of private property. And it may well be that respondents' ownership of the property here in question gives them various rights, under the laws of Pennsylvania, to limit the use of that property by members of the public in a manner that would not be permissible were the property owned by a municipality."

related in its purpose to the use to which the shopping center property was being put.

The court rejected the contention of the shopping center owners that naked title gave the owner an absolute right under state law to prohibit any use of their land by others claiming First Amendment rights without their consent. It observed were this true that:

Business enterprises located in downtown areas would be subject to on-the-spot public criticism for their practices, but businesses situated in the suburbs could largely immunize themselves from similar criticism by creating a *cordon sanitaire* of parking lots around their stores.

The court then concluded, quoting from *Marsh*:

"Ownership does not always mean absolute dominion. The more an owner, for his advantage, opens up his property for use by the public in general, the more do his rights become circumscribed by the statutory and constitutional rights of those who use it." Logan Valley Mall is the functional equivalent of a "business block" and for First Amendment purposes must be treated in substantially the same manner.

(Footnote omitted.)

Douglas, in concurring, expressed confidence that the courts of Pennsylvania could fashion a decree that would ensure noninterference with customers and employees, while enabling the union members to assemble sufficiently close to Weis' Market to make effective the exercise of their First Amendment rights.

We have quoted extensively from *Marsh* and *Amalgamated Food Employees Union Local 590 v. Logan Valley Plaza, Inc.,* 391 U.S. 308, 20 L. Ed. 2d 603, 88 S. Ct. 1601 (1968), inasmuch as they establish the framework within which the issues presented in this case must be decided.

Counsel and amicus for the shopping centers contend the action of the trial court is supported on three grounds: That the extent of the activity permitted is coextensive with the limits of the invitation of the property owner; that activities not directly related to or consonant with the use to which property is actually put may be prohibited entire-

ly; that the First Amendment may prohibit abridgment of free speech but does not require a property owner to provide a forum; and, lastly, that the malls and sidewalks do not so resemble a public thoroughfare as to make them appropriate places to exercise First Amendment rights.

It seems to us, counsel's third contention is answered by asking, as the court did in *Logan Valley*, whether the property functions as a business district and if it does, whether the roadways and sidewalks leading from building to building are the functional equivalents of the roadways and sidewalks of a normal business district.

There is no question but that both shopping centers in question do function as business districts in the most complete sense of the word. The roadways and sidewalks of the shopping centers, whatever their other purposes may be, do serve as the functional equivalents of their counterparts in a normal business district. This is true whether we speak of the covered walkways in the Northgate center or the enclosed, air-conditioned mall of Southcenter. *Tanner v. Lloyd Corp.*, 308 F. Supp. 128 (D. Ore. 1970). Amicus poses the question in their brief of where the line should be drawn between sidewalks and aisles of individual stores, emphasizing particularly, the enclosed and less clearly defined nature of the air-conditioned mall as an example of the difficulty of drawing a demarcation line. We do not minimize this difficulty but believe the Supreme Court has provided the guide by inquiring, on a case by case basis, whether the area in dispute is the functional equivalent of a street or sidewalk in a normal business district. This is a factual determination that does not lend itself to a broad, all encompassing definition.

We are not implying all private property is available for the potential exercise of First Amendment rights. A dissenting opinion, signed by four judges, in *Freeman v. Retail Clerks Union Local 1207*, 58 Wn.2d 426, 363 P.2d 803 (1961), emphasized that in a conflict between the rights of a private property owner and those desiring to exercise free speech, the rights of the private property owner are

not absolute and that a balancing of interests is necessary to reach a decision. The opinion stressed the need to inquire into the nature of the use of the property. The court noted, that while under some circumstances a shopping center owner could lose his right to ban picketing for informational purposes on his premises, the right of an owner of a 40 acre pasture for cows to exercise control over picketers wishing to use the pasture was vastly different. Where property is not ordinarily held open to the public, access to it for the purpose of exercising First Amendment rights may be denied altogether. *Adderley v. Florida,* 385 U.S. 39, 17 L. Ed. 2d 149, 87 S. Ct. 242 (1966).

The second contention of counsel for the centers, that they are not required to provide a forum for petitioners, overlooks the premise of *Logan Valley* that streets and sidewalks are the forum for First Amendment rights, and certain First Amendment privileges may be conducted on the functional equivalent of streets and sidewalks, where private property serves as a business block.

The major argument of the centers is that the solicitation of signatures for the initiative is not "directly related to" or "consonant with" the use to which the shopping center is put. The centers argue that inasmuch as the use to which a shopping center is put is conducting a retail business, any activity unrelated to that is not permitted by the holding of *Logan Valley.* We have heretofore quoted that portion of the Logan Valley opinion and n.9 where the phrases "consonant with" and "directly related to" are used.

The word "consonant" is defined by *Webster's New Int'l Dictionary* (3d ed. 1969) to mean "suiting or according with a circumstance or situation or conforming to a standard or pattern without discord or difficulty." We believe the court intended by its use of the word consonant to set the foundation for its discussion of its right to impose reasonable limitations on the exercise of First Amendment privileges in shopping centers. The portion of the opinion discussing these limitations immediately followed and indicated the court will not permit conduct which unreasona-

bly interferes with the normal use of the public of the retail functions of the shopping centers.

To give the use of the term "consonant with" an interpretation restricted to "directly related to retail functions" would seem, to us, to render meaningless *Logan Valley's* earlier carefully developed delineation of the broad rights of the public to engage in certain First Amendment practices, in areas that are the functional equivalent of public streets and sidewalks on private property, regardless of the precise nature of the surrounding commercial enterprises.

We do not interpret comments in *Logan Valley*, 391 U.S. at 320 n.9 as compelling a direct relationship between the retail functions of a shopping center and the exercise of all First Amendment privileges. There is good reason to limit picketing in a shopping center to a direct relationship to stores located within a shopping center. There is no reason for the limitation of the broad holding of *Marsh v. Alabama*, 326 U.S. 501, 90 L. Ed. 265, 66 S. Ct. 276 (1946) or *Logan Valley* as they relate to other First Amendment privileges. *Marsh*, the cornerstone for *Logan Valley*, was not a picketing case and did not require any "direct relationship."

[The balancing of conflicting interests is basic to the achievement of justice as the goal of law. As has been pointed out in Salmond on Jurisprudence 63 (12th ed. P. J. Fitzgerald 1966), the creation of substantive rules of law, whether they spring from the legislature or the judiciary, are the result of a balancing process involving more than just the individual persons before the court but extending to the broad and often conflicting interests their positions represent. The function of this aspect of law was thought by Dean Roscoe Pound[4] to maximize the fulfillment of the interests of the community and its members and to promote the smooth running of the machinery of society.

[4]Pound, *The Scope and Purpose of Sociological Jurisprudence*, 24 Harv. L. Rev. 591 (1911); 25 Harv. L. Rev. 140 (1911); Pound, *A Survey of Social Interests*, 57 Harv. L. Rev. 1 (1943).

The conflicting interests here are all of constitutional proportions. On the one side are the rights of the property owners under the Fifth and Fourteenth Amendments; and on the other side are the people's right of free speech under the First and Fourteenth Amendments and the pertinent provisions of the Washington State Constitution.[5]

As emphasized in *Marsh*, the right to exercise the liberties safeguarded by the First Amendment, "lies at the foundation of free government by free men" and occupies a preferred position in any balancing of interests. In addition, the exercise of the right of initiative in the state of Washington is an important right to the people, giving them coequal power with the legislature through means of direct legislation. It is as well, a basic rule of government of our state. *State ex rel. Mullen v. Howell*, 107 Wash. 167, 181 P. 920 (1919); *Gottstein v. Lister*, 88 Wash. 462, 153 P. 595 (1915); and *State ex rel. Case v. Superior Court*, 81 Wash. 623, 143 P. 461 (1914).

In discussing the problem implicit in the balancing of interests, the court in *Marsh* and *Logan Valley* did not state all First Amendment rights would, per se, outweigh the interests of the shopping center owner. Until this position is taken, it seems to us each case requires an inquiry into the nature of the rights sought to be asserted and their importance as weighed against the interest of the shopping center owner.

---

[5]Any right of the Council preserved under the first amendment to the United States Constitution will also be preserved to them by article 1, section 5 of the Washington State Constitution, which provides:

Every person may freely speak, write and publish on all subjects, being responsible for the abuse of that right.

*Fine Arts Guild, Inc. v. Seattle*, 74 Wn.2d 503, 512, 445 P.2d 602 (1968). The right of initiative is reserved to the people of the state of Washington by the seventh, twenty-sixth, thirtieth and thirty-sixth amendments to article 2, section 1 of the Washington State Constitution. The Council also urges their rights are protected by article 1, section 4 of the Washington State Constitution and article 1, section 19. No authority is cited to sustain this proposition. Our holding in this case makes it unnecessary to determine whether or not these sections apply.

Merely weighing the conflicting interest itself does not end the judicial process. As emphasized in *Logan Valley*:

Even where municipal or state property is open to the public generally, the exercise of First Amendment rights may be regulated so as to prevent interference with the use to which the property is ordinarily put by the State.

and

[T]he exercise of First Amendment rights may be regulated where such exercise will unduly interfere with the normal use of the public property by other members of the public with an equal right of access to it.

Inasmuch as the analogy of public streets is crucial to the holding of *Logan Valley,* the exercise of these rights on private property must be exercised in such a manner that they will not "unduly" interfere with the normal use of the property.

The court should not shrink from the possibility of creating new areas for judicial determination. In a day where casualty and commercial litigation clog our dockets, if we cannot respond to the challenge of allowing a fair opportunity to determine where and when the exercise of First Amendment rights should be permitted, we have lost sight of one of our primary reasons for existence.

Weighing the preference accorded First Amendment rights, the importance of the initiative process, the quasi public nature of the streets and sidewalks of the shopping centers, and the potential for reasonable regulation of solicitation activities, against what is at best a "diminishing fee"[6] of the property owner, we believe these considerations overbalance the centers' rights of private property.

Other courts have weighed the conflicting interests in specific instances involving the exercise of First Amendment rights in shopping centers and, without exception, have allowed them to be exercised. Handbills or picketing related to labor disputes were allowed in *Torrance, Logan Valley, Lane, Blue Ridge Shopping Center,* and *Broadmoor*

---

[6]Cross, *The Diminishing Fee,* 20 Law and Contemporary Problems 517 (1955).

*Plaza, Inc. v. Amalgamated Meat Cutters & Butcher Workmen,* 21 Ohio Misc. 245, 257 N.E.2d 420 (1969). Religious pamphlets or war protest handbills were allowed in *Marsh, Wolin,* and *Tanner.* A handbill for a political candidate was allowed in *Miller.* The California Supreme Court, in *Diamond v. Bland,* 3 Cal. 3d 653, 477 P.2d 733 (1970), has reached a conclusion identical to ours in a case that is factually indistinguishable.

We have indicated the Council has a clear legal right, subject to reasonable regulation, to solicit signatures for its initiative. They have further shown a well-grounded fear of immediate invasion of that right and that the act complained of is resulting in substantial injury to them. The prerequisites for issuance of a permanent injunction have been established. *Port of Seattle v. International Longshoremen's & Warehousemen's Union,* 52 Wn.2d 317, 324 P.2d 1099 (1958).

Northgate and Southcenter are permanently enjoined from prohibiting the Council to solicit signatures for their initiative petition on the property of the centers in those areas that are the functional equivalent of sidewalks in a public business district. The centers may impose such regulations on the solicitors for the Council as are necessary to prevent *"undue* interference" (italics ours) with other members of the public with an equal right of access to the sidewalks.

The order of the trial court is reversed and a permanent injunction issued.

HOROWITZ, A. C. J., and WILLIAMS, J., concur.

Petition for rehearing denied February 9, 1971.

Review denied by Supreme Court June 18, 1971.