[No. 7802-7-III.   Division Three.   March 17, 1988.]

THE CITY OF SUNNYSIDE, *Respondent*, v. MARY F. LOPEZ, *Petitioner.*

*Roger Garrison,* for petitioner.

*Daniel B. Heid, City Attorney,* for respondent.

McINTURFF, C.J.—We accepted discretionary review of a superior court judgment which affirmed Mary Lopez' district court conviction for criminal trespass.[1] In her appeal, Ms. Lopez contends she had a free speech right to enter the premises of the Sunnyside Professional Center and distribute anti–abortion literature. We disagree. The center is not sufficiently open to the general public to lose its character as private property and entitle individuals to access for free speech activity. Thus, we affirm Ms. Lopez' conviction.

Ms. Lopez was one of several anti–abortionists cited in August and September 1985 for criminal trespass on the premises of the center, which is located on 1½ acres of land and has approximately 110 parking spaces and 11 tenants. The tenants include a lab, a pharmacy, and several medical

---

[1]The conviction was based on a violation of Sunnyside Municipal Code 9.48-.040.

doctors. One of the doctors, Dwight Williamson, performs abortions.

The block on which the center is situated has a public sidewalk next to the street, and the center's parking lot abuts this public sidewalk. The interior side of the lot is adjacent to the center's three buildings which are connected by walkways. The walkways form a "T" within the space between the buildings. A breezeway or covered sidewalk runs along the outside perimeter of the center. The following diagram is based on the testimony and the illustrative exhibits which are part of the record:

The center's owner had posted seven "no trespassing" signs on the premises, one each at the four corners of the center and at the three entrances to the connecting walkways. The words "no trespassing" were in large type, and the following language appeared in smaller type:

NOTICE

The parking and sidewalk areas of the Sunnyside Professional Center are not public ways, and

Are reserved for the exclusive use of the Sunnyside Professional Center, its owners and tenants, and for the

Members of the public transacting business with them.

The use of such areas for any other purpose must be by the permission of the center, its owner and tenants, subject to such rules and regulation as may be imposed upon such use, and

Permission to use said areas may be revoked at any time.

Failure to comply with the above rules and regulations and failure to seek permission to come upon the premises, may expose persons to the laws of criminal trespass in the state of Washington.

Please direct your inquiries to:

Dr. Peter J. Swofford
803 E. Lincoln Avenue
Sunnyside, Washington
Phone: 837–3933

For the rules and regulations regarding permissible use.

On August 27, 1985, Ms. Lopez was on the public sidewalk next to the center's parking lot. Upon observing a man and a woman walking on the breezeway toward Dr. Williamson's office, she proceeded across the center's parking lot, and met the couple on the breezeway outside the doctor's office. According to Ms. Lopez:

I joined them there and asked them if they would accept some of my literature.

. . .

I explained that we were there . . . to offer women who were seeking abortions help with their pregnancy, whatever was driving them to destroy their baby. We were there to help them, whether it was financial, medical, housing, food . . .

And they stopped for a minute, and then the woman went on inside, and her husband . . . stayed out there, and he accepted my literature, and he was talking to me. I asked him if he would . . . go into Dr. Williamson's office and ask his wife to come out and visit with me for a few minutes, and he said he would, and at this time, we were right at the corner of the pharmacy.

At this point, one of Dr. Williamson's employees came out of his office and told Ms. Lopez to leave the property. The employee took a Polaroid picture of Ms. Lopez when she remained to wait for the husband. The police arrived and, on the basis of the photograph, cited Ms. Lopez for trespassing.

At the close of the City's case, Ms. Lopez unsuccessfully moved to dismiss on the basis that she was arrested for a misdemeanor not committed in the arresting officer's presence, contrary to RCW 10.31.100.[2] At the close of all the evidence, the District Court concluded the center was "the functional equivalent of a community business block, or tantamount to public property." But is also concluded Ms. Lopez' activities on August 27, 1985, were beyond the reasonable exercise of free speech and, therefore, convicted her of trespass.

On review of Ms. Lopez' conviction, pursuant to RALJ 9.1, the Superior Court held the District Court had not committed any error of law which would affect the outcome of the case, although it criticized that part of the court's analysis which concluded the center was the functional equivalent of a community business block. The Superior Court also agreed with the District Court that the alleged violation of RCW 10.31.100 did not constitute grounds for dismissal of the trespass charge.

First, is the Sunnyside Professional Center sufficiently open to the public in general to entitle individuals to access for free speech activity?[3]

---

[2]RCW 10.31.100 provides, in part: "A police officer may arrest a person without a warrant for committing a misdemeanor or gross misdemeanor only when the offense is committed in the presence of the officer, . . ."

[3]The City cites *Bering v. Share,* 106 Wn.2d 212, 721 P.2d 918 (1986), *cert. dismissed,* ___ U.S. ___, 93 L. Ed. 2d 990, 107 S. Ct. 940 (1987). That decision, which affirmed an injunction limiting anti–abortion activities and contempt orders issued thereunder, is not helpful in resolving the issue here. *Bering* involved the validity of *time, place and manner* restrictions regulating speech on a *public* sidewalk. The court did not address the issue of whether free speech activities must be allowed on privately owned property.

The first amendment[4] to the United States Constitution protects free speech only from government imposed restraints. *Hudgens v. NLRB,* 424 U.S. 507, 47 L. Ed. 2d 196, 96 S. Ct. 1029 (1976). Nevertheless, state law may confer a right on individuals to speak or petition on private property if the exercise of the right does not unreasonably interfere with the constitutional rights of the owner. *Pruneyard Shopping Ctr. v. Robins,* 447 U.S. 74, 64 L. Ed. 2d 741, 100 S. Ct. 2035 (1980) (applying California law). The Washington court has held in a plurality opinion that article 1, section 5 of the Washington Constitution,[5] which is substantially similar to the California constitutional speech guaranty, does not require state action. *Alderwood Assocs. v. Washington Envtl. Coun.,* 96 Wn.2d 230, 243, 635 P.2d 108 (1981).

■ Ms. Lopez relies on Washington's constitution in asserting she had a free speech right to enter the center and distribute anti–abortion information. In determining whether her speech activity is protected, the court balances several factors:

> The first is the use and nature of the private property. As property becomes the functional equivalent of a downtown area or other public forum, reasonable speech activities become less of an intrusion on the owner's autonomy interests. When property is open to the public, the owner has a reduced expectation of privacy and, as a corollary, any speech activity is less threatening to the property's value.

(Citations omitted.) *Alderwood,* at 244.

The second factor for the court to consider is the nature of the speech activity. "The exercise of free speech is given great weight in the balance, because it is a preferred right." *Alderwood,* at 244.

---

[4]The first amendment to the United States Constitution provides: "Congress shall make no law . . . abridging the freedom of speech . . ."

[5]"Every person may freely speak, write and publish on all subjects . . ." Const. art. 1, § 5.

The third factor is whether the potential exists for reasonable regulation of the speech. Some speech activity may be so unreasonable that it violates the property owner's First Amendment right not to participate in the dissemination of an ideological message or amounts to an uncompensated taking of private property. *Alderwood,* at 245.

In *Alderwood,* the court found that the free speech rights of citizens seeking signatures on petitions for an initiative outweighed the property rights of the owners of a large shopping mall. The court observed that the shopping centers of today are the new public forums; forums which were traditionally provided by the town center or community business block. To exclude the speech activity of the petitioners there would greatly reduce their ability to exchange ideas and gather the requisite number of initiative signatures. *Alderwood,* at 246.

The City distinguishes *Alderwood* on the basis of size. Alderwood Mall covers 110 acres, contains more than 6,000 parking spaces, and impact statements on file projected 22,000 cars entering the mall on an average day in 1978. *Alderwood,* at 232. Sunnyside Professional Center is situated on 1½ acres and has approximately 110 parking spaces. The City relies on language in *Robins v. Pruneyard Shopping Ctr.,* 23 Cal. 3d 899, 910–11, 592 P.2d 341, 347–48, 153 Cal. Rptr. 854, 860 (1979), *aff'd,* 447 U.S. 74, 64 L. Ed. 2d 741, 100 S. Ct. 2035 (1980), which also concerned a shopping mall, that if the case had involved the proprietor of a modest retail establishment, a different result might have been reached.

Several jurisdictions have decided that the private property rights of medical center tenants and owners override the right of a citizen to express anti–abortion sentiments. Some of these decisions are based on First Amendment grounds alone, or on state constitutional free speech provisions which have been interpreted to require state action. *See, e.g., Ingram v. Problem Pregnancy of Worcester, Inc.,* 396 Mass. 720, 488 N.E.2d 408 (1986); *Kugler v. Ryan,* 682 S.W.2d 47 (Mo. Ct. App. 1984); *Hoffart v. State,* 686

S.W.2d 259 (Tex. Ct. App. 1985), *cert. denied,* ___ U.S. ___, 93 L. Ed. 2d 46, 107 S. Ct. 95, *reh'g denied,* ___ U.S. ___, 93 L. Ed. 2d 423, 107 S. Ct. 478 (1986); *State v. Horn,* 139 Wis. 2d 473, 407 N.W.2d 854 (1987). These latter jurisdictions are distinguishable from ours which imposes no state action requirement.

However, the courts of New Jersey, which interpret its constitutional free speech provision in the same manner as Washington, also rule in favor of the property interests in these situations. *State v. Brown,* 212 N.J. Super. 61, 513 A.2d 974, *cert. denied,* 107 N.J. 53, 526 A.2d 140 (1986); *Planned Parenthood of Monmouth Cy., Inc. v. Cannizzaro,* 204 N.J. Super. 531, 499 A.2d 535 (1985), *aff'd,* 217 N.J. Super. 623, 526 A.2d 741 (1987) (adopting opinion of Chancery Division); *Brown v. Davis,* 203 N.J. Super. 41, 495 A.2d 900 (1984).

In *Brown v. Davis, supra,* an anti–abortion group sought to enjoin the prosecution of one of its members for criminal trespass. She was arrested when she entered the parking lot of a medical center to place anti–abortion literature on a parked car. The center was situated on 2 acres and was comprised of three single story buildings separated by common areas used for parking. One of the tenants performed abortions, and the other tenants were various business enterprises offering services other then retail sales to the general public. The court held that the owner had not sufficiently dedicated the property to public use to entitle individuals to access for speech activity, reasoning:

> The [building] is not the functional equivalent of a suburban shopping center, which may be characterized as an alternative to an urban downtown shopping area where the public at large is invited. The Center is normally used by employees of tenants and prospective customers visiting specific businesses for the limited services made available to them. It is not a place to which a general consumer would go to shop for personal, household or general business merchandise.

*Brown v. Davis, supra* at 47.

*State v. Brown, supra,* considered the same abortion protester's appeal of her criminal conviction for trespass. The court rejected the defendant's argument that she had a right to free speech activity on the center's property, stating: "This is private property bearing no resemblance to a public forum. The invitation of the Center [to its specific business invitees] 'is clearly for private and personal purposes.'" *State v. Brown, supra* at 67 (quoting *Planned Parenthood of Monmouth Cy., Inc. v. Cannizzaro,* 499 A.2d at 540).

We hold that the specific invitation extended by the doctor–tenants of Sunnyside Professional Center to members of the public who seek their medical expertise is not sufficient to classify the center as open to public use. Unlike a shopping mall, Sunnyside Professional Center is not a successor to the public forum historically provided by the streets and sidewalks of the town business district. It presents no significant opportunity to disseminate ideas, and prohibiting such activity on its premises does not curtail the realistic opportunity of citizens to exercise their right of free speech. The center was not the functional equivalent of a public place; Ms. Lopez had no constitutional right of access to the center for speech activities.[6]

The one factor here that was not a factor in the New Jersey cases is the presence of the pharmacy as a tenant, which might be viewed as offering a more general invitation to enter than do the doctors. But, as noted above, *Alderwood* favorably cites language in *Pruneyard* that a modest

---

[6]Ms. Lopez argues that because the District Court's conclusion that the center is the functional equivalent of public property was unchallenged by the City, it cannot be disturbed on appeal. While unchallenged *findings* are accepted as verities on appeal, *Beggs v. Pasco,* 93 Wn.2d 682, 685, 611 P.2d 1252 (1980), Ms. Lopez cites no authority for a similar rule regarding conclusions. Under the rule which authorizes a reviewing court to affirm a judgment on any grounds within the pleadings and the proof, this court can affirm Ms. Lopez' trespass conviction even though it disagrees with the District Court's conclusion regarding the public character of the center. *See Lucas Flour Co. v. Local 174, Teamsters, Chauffeurs, Warehousemen & Helpers,* 57 Wn.2d 95, 103, 356 P.2d 1 (1960), *aff'd,* 369 U.S. 95, 7 L. Ed. 2d 593, 82 S. Ct. 571 (1962).

retail establishment is not comparable to a large mall. The record does not indicate the size of the pharmacy or the number of customers it draws on a regular basis. We do know it is 1 of 11 tenants of the center and shares a 1½ – acre site and about 110 parking spaces with these other tenants. Given these facts, we hold the pharmacy is a modest retail establishment without the public forum potential that would require access for free speech activities.

Thus, we do not reach the remaining two considerations weighed in *Alderwood, i.e.*, the nature of the speech and the potential for reasonable regulation. Under our holding, the center is private property and its owners may bar the exercise of free speech regardless of its nature or whether it is possible to reasonably regulate it.[7]

■ Finally, we address the concern raised by the dissenting opinion, *infra*. The dissent would limit *Alderwood* to situations in which "state action" is not present. According to the dissent, the arrest of Ms. Lopez for criminal trespass constituted "state action", making unnecessary the

---

[7]The right to exclude others is an essential stick in the bundle of property rights. *Kaiser Aetna v. United States*, 444 U.S. 164, 62 L. Ed. 2d 332, 346, 100 S. Ct. 383 (1979). This property right may be protected by utilization of criminal trespass laws in appropriate cases. Section 9.48.040 of the Sunnyside Municipal Code provides that "[a] person is guilty of criminal trespass in the second degree if he knowingly enters or remains unlawfully in or upon premises of another."

Here, the undisputed evidence is that "no trespassing" signs were posted at the entrances to the interior walkways of the center, Dr. Williamson's office occupied the corner of a building next to one of these entrances, Ms. Lopez entered the breezeway near Dr. Williamson's office, and she remained after an employee told her to leave the property. This evidence is such that a rational trier of fact could have found beyond a reasonable doubt that Ms. Lopez knowingly entered and remained unlawfully upon the premises of another. *See State v. Green*, 94 Wn.2d 216, 221, 616 P.2d 628 (1980).

The fact that the center's tenants issued a specific invitation to certain members of the public does not mean all members of the public had a license to enter. Such reasoning leads to illogical results. Proprietors of private retail businesses which are not the functional equivalent of a public forum are not required to accommodate the public's nonbusiness uses of their facilities. If the invitation to enter is limited either expressly or impliedly from the circumstances, then the proprietor has the right to the protection afforded by the trespass laws.

limiting factors adopted in *Alderwood*. We disagree. A similar argument was rejected persuasively in *State v. Horn*, 407 N.W.2d at 859–60:

Under Defendants' theory, if a private property owner could successfully remove a trespasser without resorting to calling the police, then no free speech right arises to protect the trespasser from being ejected. However, if the property owner must rely on police to remove the trespasser, the trespasser's speech rights arise, since the action by police constitutes governmental interference. The trespasser is, paradoxically, immune from prosecution for trespass.

Enforcement of trespass laws by the government should not have the effect of transforming private interference with free speech activities into state interference. To so hold precludes the private property owner from enforcing his right to exclude others and converts his property into a public forum, open to the free use of any person exercising a First Amendment right.

Second, if Ms. Lopez was arrested in violation of RCW 10.31.100, which permits warrantless arrests for misdemeanors only when the offense is committed in the officer's presence, must this prosecution be dismissed?

Ms. Lopez relies on former JCrR 2.01[8] in effect at the time of her arrest, which provided that a "citation and notice when signed by the citing officer and filed with a court of competent jurisdiction shall be deemed a lawful complaint for the purpose of initiating prosecution of the offense charged therein." Former JCrR 2.01(b)(4). Since JCrR 2.01(b)(1) referred to the cited individual as being "arrested", she argues that the court assumes no jurisdiction based upon the citation unless there is a valid arrest. Specifically, JCrR 2.01(b)(1) stated:

---

[8]The new rule, CrRLJ 2.1(b)(1), reads:

"Whenever a person is arrested or *could have been arrested* pursuant to statute for a violation of law which is punishable as a misdemeanor . . . the arresting officer, or any other authorized peace officer, may serve upon the person a citation and notice to appear in court." (Italics ours.)

> Whenever a person is *arrested* for a violation of law which is punishable as a misdemeanor . . . the arresting officer, or any other authorized peace officer, may serve upon the arrested person a citation and notice to appear in court, in lieu of continued custody.

(Italics ours.) We disagree with Ms. Lopez' interpretation of the rule.

■ The fact that the procedural rule refers to a person who is issued a citation as being "arrested" does not mean the validity of the citation is dependent on the validity of the arrest. We have analyzed former JCrR 2.01 in the context of whether a criminal charge should be dismissed because the citing officer improperly required bail as a condition for the defendant's release. *State v. Green*, 42 Wn. App. 482, 711 P.2d 1103 (1985). There, the defendant maintained the bail requirement rendered the citation invalid, depriving the court of jurisdiction. The court held that since the defendant had accepted the citation and agreed to appear, the court had jurisdiction over her. *Green*, at 484. Similarly, the alleged illegal arrest here does not make the citation issued under former JCrR 2.01 defective. The illegal arrest of a defendant does not prevent his subsequent prosecution so long as the evidence utilized in the prosecution arises from sources independent of the arrest and is untainted by it. *Pasco v. Titus*, 26 Wn. App. 412, 417, 613 P.2d 181, *review denied*, 94 Wn.2d 1005 (1980).[9] Thus, the court did not err in denying Ms. Lopez' motion to dismiss.

The judgment of the Superior Court is affirmed.

GREEN, J., concurs.

---

[9]*State v. Klinker*, 85 Wn.2d 509, 537 P.2d 268 (1975), relied upon by Ms. Lopez, is not helpful. There, the court found unconstitutional the statutory arrest procedure by which filiation actions were commenced, and thus dismissed the action against the defendant *without prejudice* to the State's right to amend its complaint. *Klinker*, at 510, 524. Ms. Lopez does not challenge the constitutionality of former JCrR 2.01, by which the court acquired jurisdiction in her case. Rather, her challenge concerns the propriety of the arrest itself, not the law which authorized it. In these circumstances, *Klinker* does not apply.

THOMPSON, J. (dissenting)—I dissent. I question the applicability and weight given *Alderwood Assocs. v. Washington Envtl. Coun.*, 96 Wn.2d 230, 635 P.2d 108 (1981),[10] on which the majority relies.

In *Alderwood,* the court addressed the propriety of a temporary restraining order enjoining solicitation of signatures in a shopping center. There was no direct state involvement in the form of criminal arrests and prosecutions. In this case, Sunnyside became directly involved in the controversy by arresting and prosecuting Ms. Lopez for criminal trespass. This involvement constitutes "state action". *See Sutherland v. Southcenter Shopping Ctr., Inc.,* 3 Wn. App. 833, 836, 478 P.2d 792 (1970), which held that shopping centers' "use of deputized security personnel and the request to petitioners to leave the premises as a necessary prelude to establishing an action for criminal trespass" invoked the Fourteenth Amendment's "state action" requirement.

It is generally recognized that the Supreme Court's focus, in the line of cases beginning with *Marsh v. Alabama,* 326 U.S. 501, 90 L. Ed. 265, 66 S. Ct. 276 (1946), on the nature of the property involved is an alternate way of establishing state action. *See* 1 C. Antieau, *Modern Constitutional Law* § 8:6 (Supp. 1987); L. Tribe, *American Constitutional Law* § 18–5, at 1708–11 (2d ed. 1988). The *Alderwood* decision appears to have adopted this approach by declining to find a "state action" requirement in Const. art. 1, § 5, while failing to address the question in any context other than the nature of the property. *See* Note, *Free Speech, Initiative and Property Rights in Conflict—Four Alternatives to the State Action Requirement in Washington,* 58 Wash. L. Rev. 587 (1983).

The arrest of Ms. Lopez is a direct demonstration of "state action", and discussion of any alternative method is

---

[10]Both the concurrence and the dissent (a total of five justices) objected to the plurality's analysis of state constitutional free speech protections, and, until today, no Washington decision has applied its constitutional rationale.

unnecessary. There was no such direct "state action" in *Alderwood,* and the *Alderwood* test thus applies only to those situations in which "state action" is not present. In adopting a 3–part balancing test, *Alderwood* tried to avoid making a constitutional issue out of "every private conflict involving speech and property rights . . ." *Alderwood,* at 243. Clearly, *Alderwood* was concerned with *private* conflicts. This is not such a case.

In addressing this dissent, the majority is concerned with the apparent paradox that, by causing the arrest of a trespasser, the property owner invokes the trespasser's free speech rights and thus makes the trespasser immune from prosecution for trespassing. If the "trespasser" is arrested solely for the content of her speech, as appears to be the case here,[11] such a result is entirely consistent with the First Amendment and Const. art. 1, § 5.

The majority is further rejecting the reasoning presented herein because private property owners would be precluded from enforcing their rights to exclude others, and would convert private property into a public forum. *Alderwood* itself does precisely that, subject to the 3–part balancing test.

Here, the arrest of Ms. Lopez transformed the private dispute into a public one. As a result, the limiting factors as adopted by *Alderwood* are unnecessary. Rather, the inquiry involves balancing the rights of the property owner against Ms. Lopez' right to free speech. *See Sutherland,* at 843–44; *Freeman v. Retail Clerks, Local 1207,* 58 Wn.2d 426, 432–33, 363 P.2d 803 (1961) (Hill, J., concurring); *State v. Schmid,* 84 N.J. 535, 423 A.2d 615, 635–36 (1980) (Pashman, J., concurring in part, dissenting in part).

The majority holds because the medical center is not the "functional equivalent" of a downtown area, Ms. Lopez has

---

[11]It is noteworthy that even those who had not ventured into the breezeway area were arrested. This would indicate the reason for the arrest bore little relationship to protecting property and that Ms. Lopez was arrested because the property owners objected to what she was saying.

*no* free speech rights.[12] While it may be agreed that the center is not the "functional equivalent" of a downtown area or even of a large shopping center, one must recognize that it is more "public" than, for example, a private residence. Thus, while the center may not be open to the extent that a large shopping center would be, it should be subject to at least a diminished right of free speech by Ms. Lopez.

At the time of her arrest, Ms. Lopez appears to have been engaged in "pure" speech. *See Sutherland,* at 836; *Cox v. Louisiana,* 379 U.S. 559, 13 L. Ed. 2d 487, 85 S. Ct. 476 (1965). She was not impeding access to the center's tenants, nor was she harassing or verbally abusing potential patients. Her activities were not found to have financial impact on the center.[13] Her interest in free speech clearly outweighs the center's interest in protecting its property.

Review denied by Supreme Court June 2, 1988.

---

[12]The majority concludes simply that the center is private property. In a footnote, the decision refers to the right to exclude others as an essential element of property ownership. In *Alderwood,* the property was undeniably private. The issue was whether the use to which the property was being put created an increased level of constitutional protection for freedom of speech.

[13]As the majority notes, this is not a situation, as in *Bering v. Share,* 106 Wn.2d 212, 721 P.2d 918 (1986), *cert. dismissed,* ___ U.S. ___, 93 L. Ed. 2d 990, 107 S. Ct. 940 (1987), in which the issue was the validity of restrictions on use of a public sidewalk. Here, the issue is application of criminal trespass laws that undeniably restrict freedom of speech. The potential validity or invalidity of reasonable restrictions on Ms. Lopez' activities is not addressed here.