989 P.2d 524 (1999)
139 Wash.2d 623
WAREMART, INC., an Idaho corporation, Respondent,
v.
PROGRESSIVE CAMPAIGNS, INC., a California corporation; John Does I through 50, and Jane Does 1 through 50, Appellants.
No. 67029-3.
Supreme Court of Washington, En Banc.
Argued June 10, 1999.
Decided December 16, 1999.
*525 Preston, Gates & Ellis, Paul J. Lawrence, Marc C. Levy, Seattle, Christina M. Hutchins, Portland, OR, for Appellants.
Charles Hinkle, Portland, OR, for Respondent.
ALEXANDER, J.
Waremart, Inc. (Waremart) brought an action in Clark County Superior Court for declaratory and injunctive relief against Progressive Campaigns, Inc. (Progressive), a corporation which manages initiative petition signature gathering campaigns. Waremart sought to enjoin Progressive and its employees from gathering signatures for initiative petitions on its property, asserting that Progressive had no legally protected right to enter its property for the purpose of soliciting signatures for initiative petitions. The Clark County Superior Court agreed with Waremart and permanently enjoined Progressive, and persons acting in concert with it, from entering Waremart's premises for the above described purposes. We granted Progressive's petition for direct review and now affirm the superior court in all respects.

I
Progressive, the appellant, is a profit-making California corporation engaged in "political work" primarily consisting of: (1) gathering signatures for the purpose of "qualifying initiatives for the ballot"; and (2) "field campaign work." Report of Proceedings (RP) at 19. As a part of its business, Progressive hires "petitioners," and pays them for every valid signature that they gather in support of the initiative campaign in which Progressive is engaged. RP at 21. Waremart, the respondent, is an Idaho corporation which owns and operates three retail grocery stores in Washington. Two of these stores are called "Cub Foods" and are located in the Vancouver, Washington area. One of the Vancouver area stores is located in the Vancouver Plaza and the other is in the community of Hazel Dell. The third store is located in Kennewick. The record indicates that the "Hazel Dell and Kennewick stores are located in single free-standing buildings, and the Vancouver Plaza store is located in a strip mall." Resp. Br. of Resp't at 41.
Each of Waremart's stores attracts approximately 30,000 customers per week and carries essentially the same product base of grocery items and other goods commonly sold in large retail grocery outlets.[1] Waremart focuses, however, on "sell[ing] groceries" at what it claims is "the cheapest price, or the lowest prices that [it] can in the market area." RP at 133-34.
All of Waremart's stores have essentially the same physical layout. The trial court made findings in that regard that
[e]ach store is basically surrounded by an extensive parking area with only a narrow sidewalk bordering the store. There is no plaza or communal area for the public to congregate either inside or on the exterior. Immediately adjacent to the sidewalk is a traffic lane which[,] due to the high volume of vehicles, requires numerous warning signs to warn pedestrians.
Clerk's Papers (CP) at 133. It also found that "Waremart has chosen not to utilize mass advertising. [Waremart's] Washington stores do not promote any public services on their locations nor do they open up areas within their stores to such activities as mall walkers or choir groups." CP at 133-34.
In 1996 and 1997, petitioners hired by Progressive entered the properties upon which the Waremart's stores are located and solicited some of Waremart's customers to sign initiative petitions. The management at all three stores subsequently received complaints from some customers regarding being approached by Progressive's employees. Waremart informed Progressive that its policy was "to prohibit all initiative petitioning on its premises, and ... requested them to *526 tell the persons whom it ha[d] recruited not to engage in petitioning activity at [its] stores." CP at 4. Progressive refused to comply with this request. Waremart then brought suit against Progressive in Clark County Superior Court, seeking a declaratory judgment that it had the
legal right to deny entry to the premises of its Cub Foods and Waremart stores in Washington to persons who seek entry to those premises for purposes of soliciting signatures on petitions to place issues or measures on election ballots, and that it has the legal right to direct such persons to leave its premises.
CP at 10. In addition, Waremart sought an order "[e]njoining [Progressive] and all persons in active concert and participation with them from entering the premises of plaintiff's Cub Foods and Waremart stores in Washington for the purpose of soliciting plaintiff's customers and prospective customers to sign initiative petitions." CP at 11.
After a hearing, the trial court held that:
1. [Waremart's] Washington stores are not `the functional equivalent of a downtown area or other public forum,' and they do not perform `a traditional public function by providing the functional equivalent of a town square or community business block'....
2. [Waremart] is not required to allow [Progressive's] petitioners to solicit signatures inside its three Washington stores or on the sidewalks and parking lots adjacent to its three Washington stores.
3. [Waremart] has a clear legal and equitable right to preserve, maintain, and use its property at its three Washington stores for its own retail sales operations. As a private owner and lessee of the property at those three locations, [Waremart] has power to preserve the property under its control for the use to which it is lawfully dedicated, and is under no obligation to permit [Progressive] to engage in petitioning activity on its property.
4. By their conduct in entering the premises of [Waremart's] Washington stores for the purpose of soliciting [Waremart's] customers to sign initiative petitions, persons recruited and paid by [Progressive] have caused and threaten to continue to cause an immediate invasion of [Waremart's] right to preserve, maintain, and use the property at its three Washington stores for its own retail sales operations.
CP at 134-35. The trial court permanently enjoined Progressive, and all persons in active concert with it, "from entering the premises of plaintiff's Washington stores for the purpose of soliciting plaintiff's customers and prospective customers to sign initiative petitions." CP at 139. Progressive sought direct review from this court, contending that the initiative provision of the state constitution provides them with the right to engage in the aforementioned activities on Waremart's property. We granted its petition.

II
A party seeking injunctive relief must establish: (1) that the movant has a clear legal or equitable right; (2) that the movant has a well-grounded fear of immediate invasion of that right; and (3) that the acts complained of are either resulting in or will result in actual and substantial injury to the movant. King v. Riveland, 125 Wash.2d 500, 515, 886 P.2d 160 (1994). The trial court, as previously noted, found that Waremart had satisfied the aforementioned criteria, and, therefore, granted its request for a permanent injunction against Progressive. In reviewing this decision, we are mindful of the principle that the "granting or withholding of an injunction is addressed to the sound discretion of the trial court to be exercised according to the circumstances of each case." Washington Fed'n of State Employees, Council 28 v. State, 99 Wash.2d 878, 887, 665 P.2d 1337 (1983). Furthermore, the "trial court's decision exercising that discretion will be upheld unless it is based upon untenable grounds, or is manifestly unreasonable, or is arbitrary." King, 125 Wash.2d at 515, 886 P.2d 160; see also Brown v. Voss, 105 Wash.2d 366, 372, 715 P.2d 514 (1986) (stating that it is a fundamental principle that a "trial Court is vested with a broad discretionary power to shape and fashion injunctive relief to fit the particular facts, circumstances, and equities of the case before *527 it. Appellate courts give great weight to the trial court's exercise of that discretion."). Accordingly, we must accord the trial court great deference and review its decision only for an abuse of discretion.

III
There are two cases that have emanated from this court, Southcenter Joint Venture v. National Democratic Policy Comm., 113 Wash.2d 413, 780 P.2d 1282 (1989) and Alderwood Assocs. v. Washington Envtl. Council, 96 Wash.2d 230, 635 P.2d 108 (1981), which have a particular bearing upon our decision in this case. In Alderwood, the issue before us was whether "Washington law[[2]] permits signature solicitation [for an initiative] at privately owned shopping centers."Alderwood., 96 Wash.2d at 240, 635 P.2d 108. There, a four member plurality held that both article I, section 5 (the free speech provision)[3]and article II, section 1(a) (amend. 7) (the initiative provision) of the state constitution both protected the right of initiative petitioners to gather signatures upon the private property of the Alderwood shopping mall in Snohomish County, "a regional shopping center with more than 1,000,000 square feet of store area on 110 acres of land." Alderwood, 96 Wash.2d at 232, 635 P.2d 108.
In concluding that article I, section 5 and article II, section 1(a) (amend. 7) each provided initiative petitioners with a right to gather signatures at the Alderwood shopping mall, the plurality noted that "[d]etermining when the Washington speech and initiative guaranties will apply to private conduct must evolve with each decision, for an all inclusive definition is not practicable. The approach, however, involves balancing several factors." Alderwood, 96 Wash.2d at 244, 635 P.2d 108. These factors, according to the four justices are: (1) the nature and use of the property; (2) the nature of the speech activity; (3) the potential for reasonable regulation of the speech; and (4) whether barring the activity would significantly undermine free speech or the effectiveness of the initiative process. Alderwood, 96 Wash.2d at 244-46, 635 P.2d 108. In regard to this last factor, the plurality found it particularly important that:
The shopping center now performs a traditional public function by providing the functional equivalent of a town center or community business block. There are, as of 1980, 139 shopping centers in the Seattle metropolitan area. Seattle Post-Intelligencer, Shopping Center Directory (1980). (Area includes the 60-mile corridor between Everett and Tacoma). The ability to gather the requisite number of initiative signatures, and to communicate ideas, would be greatly reduced if access to those centers were denied.
Alderwood, 96 Wash.2d at 246, 635 P.2d 108. Finally, the plurality in Alderwood concluded that:
After balancing all these factors and having found that the owners' constitutional rights were not violated, we believe that petitioners' activities were protected. As already noted, free speech is accorded considerable weight in the balance. Added to that is this State's vital interest in the initiative process. The only offsetting consideration is the mall owners' private autonomy interests, which are quite minimal in the context of shopping centers.
Alderwood, 96 Wash.2d at 246, 635 P.2d 108. Justice Dolliver concurred with the result reached by the plurality, indicating that he agreed with the four justices insofar as they concluded that article II, section 1(a) (amend. 7) of the state constitution precluded the owners of the Alderwood Mall from excluding the proponents of the initiative from gathering signatures on mall property. He based his conclusion to a large extent upon this court's reasoning in Maple Leaf Investors, Inc. v. Department of Ecology, 88 *528 Wash.2d 726, 731, 565 P.2d 1162 (1977), wherein we stated that "[t]he question essentially is one of social policy which requires the balancing of the public interest in regulating the use of private property against the interests of private landowners not to be encumbered by restrictions on the use of their property." Alderwood, 96 Wash.2d at 252, 635 P.2d 108 (Dolliver, J., concurring) (quoting Maple Leaf Investors, 88 Wash.2d at 731, 565 P.2d 1162).
Justice Dolliver expressed disagreement, however, with the plurality to the extent that it concluded that the initiative petitioners had a right to gather signatures on private property pursuant to article I, section 5 of the Washington Constitution. Justice Dolliver reasoned that this provision was not implicated because there was no state action. He observed in that regard that in
holding Const. art. 1, § 5 may be used by one individual to enforce action against another, the majority has made an unprecedented change in the application of this state's constitution. It interprets the constitution in a way which has never been done since that document was adopted in 1889.
Alderwood, 96 Wash.2d at 247, 635 P.2d 108 (Dolliver, J., concurring).
In short, the five justice majority in Alderwood coalesced only on the conclusion that article II, section 1(a) (amend. 7) of the state constitution provides protection to initiative petitioners to gather signatures at large shopping malls, such as the Alderwood Mall, which have become "the functional equivalent of a downtown area or other public forum." Alderwood, 96 Wash.2d at 244, 635 P.2d 108. The four dissenting justices, on the other hand, disagreed with the majority in all respects. They concluded that "`state action'" was necessary to invoke the protections of either article I, section 5 or article II, section 1(a) (amend. 7) and that those provisions may not be used by one private citizen to enforce action against another. Alderwood, 96 Wash.2d at 254, 635 P.2d 108 (Stafford, J., dissenting).
Eight years later, in Southcenter Joint Venture v. National Democratic Policy Comm., this court again visited article I, section 5, this time to determine "whether a political organization has a right under the free speech provision of the Constitution of the State of Washington to solicit contributions and sell literature in a privately owned shopping mall."[4]Southcenter, 113 Wash.2d at 415, 780 P.2d 1282 (emphasis omitted). We took note there of our decision in Alderwood and observed that five members of this court (Justice Dolliver and the four dissenters) concluded in Alderwood that in order to invoke the protections of the free speech provision of our state constitution there must be "`state action.'" Southcenter, 113 Wash.2d at 428, 780 P.2d 1282. A majority in Southcenter reaffirmed the view espoused by Justice Dolliver in Alderwood, to the effect that "the free speech provision of our state constitution protects an individual only against actions of the State; it does not protect against actions of other private individuals. The [defendant] thus has no right under Const. art. 1, § 5 to solicit contributions and sell literature at the mall." Southcenter, 113 Wash.2d at 430, 780 P.2d 1282. The Southcenter majority went on to note that
the holding in Alderwood was simply that people have a right under the initiative provision of the Constitution of the State of Washington to solicit signatures for an initiative in a manner that does not violate or unreasonably restrict the rights of private property owners. We expressly do not here disturb that holding.
Southcenter, 113 Wash.2d at 428-29, 780 P.2d 1282 (footnotes omitted). Significantly, as Justice Utter noted in a concurring opinion, the majority in Southcenter left "undisturbed the result in Alderwood which recognizes the State's duty to enforce an individual's right to petition on certain private property [i.e., large shopping malls]." Southcenter, 113 Wash.2d at 435, 780 P.2d 1282 (Utter, J., concurring in the result).
With that background in mind, we now confront an issue that is not directly resolved by the aforementioned cases, i.e., *529 whether article II, section 1(a) (amend. 72) of our state constitution protects the gathering of signatures on initiative petitions on private property having the characteristics of Waremart's stores. Southcenter is not directly applicable because article II, section 1(a) (amend. 72) was not at issue in that case. Furthermore, while Alderwood is instructive, it is not dispositive because the private property at issue there was significantly different from Waremart's property. As noted above, we observed in Alderwood that the Alderwood Mall was a large regional shopping center which "now performs a traditional public function by providing the functional equivalent of a town center or community business block." Alderwood, 96 Wash.2d at 246, 635 P.2d 108. Here, the trial court found that Waremart's stores "bear none of the characteristics of a town center" and determined that Waremart's stores "are not `the functional equivalent of a downtown area or other public forum.'" CP at 134. Although the trial court denominated the latter determination a "conclusion[ ] of law," we believe that, at best, it is a mixed question of fact and law. CP at 134. To the extent that it is a finding of fact, though, we are satisfied that it is supported by substantial evidence in the record. Therefore, it is a verity, as are the other trial court findings of fact that we have set forth above.[5]See State v. Hill, 123 Wash.2d 641, 647, 870 P.2d 313 (1994) ("Where there is substantial evidence in the record supporting the challenged facts, those facts will be binding on appeal.").
Progressive has, however, assigned error to the aforementioned conclusion of law, stating that it is "contrary to the law in Washington." Br. of Appellant at 3. It contends that article II, section 1(a) (amend. 72) of the state constitution provides it with a broad right of access to large retail stores, like Waremart's stores, for the purpose of gathering signatures on initiative petitions. Accordingly, Progressive asserts that this court should reverse the trial court's decision to grant Waremart's request for an injunction and conclude that "petitioners such as Progressive Campaigns should be permitted access to the sidewalks in front of Waremart's stores subject to reasonable time, place and manner restrictions." Br. of Appellant at 18. Progressive supports its contention by asserting that: (1) Alderwood and Southcenter demonstrate that article II, section 1(a) (amend. 72) of the Washington Constitution provides it with a right of access, for the purpose of soliciting signatures for an initiative, to private sidewalks in front of large retail stores; and (2) a balancing of the factors listed in Alderwood, regarding the benefits of allowing petitioning against the burdens upon Waremart, also supports granting it access to Waremart's private property.
Waremart responds that we should affirm the trial court. It contends that: (1) this court should overrule "what is left of Alderwood "; (2) "if Alderwood is not overruled, it should be limited to its facts"; (3) "recognizing and enforcing a `right' to gather signatures at Waremart's stores would violate Waremart's free expression rights"; and (4) an "extension of the Alderwood holding to Waremart's stores would constitute a taking without just compensation." Resp. Br. of Resp't at 13, 31, 39, 42.
Waremart's contention that we should overrule "what is left of Alderwood "is based on its view that "[t]here is nothing in [that]... opinion that specifically recognizes an independent right to petition on private property under [the initiative provision of the state constitution] alone without the crucial free speech and balancing analysis that was based on Article I, section 5." Resp. Br. of Resp't at 14. We disagree with Waremart. As we have observed above, the state constitutional provision that protects a person's right to circulate initiative petitions on private property is article II, section 1(a) (amend. 72), which provides, in relevant part, that the "first power reserved by the people is the initiative." Contrary to Waremart's assertion, we concluded in Alderwood that this provision specifically guarantees the right to gather signatures for initiatives at large shopping malls. Furthermore, in Southcenter we reviewed our decision in Alderwood *530 and expressly stated that we "do not here disturb [the aforementioned] holding [in Alderwood]." Southcenter, 113 Wash.2d at 429, 780 P.2d 1282. Waremart's assertion that Alderwood did not establish an independent right, based upon article II, section 1(a) of the state constitution, to gather signatures for initiatives on certain types of private property ignores the plain letter of our decision in Alderwood and our holding in Southcenter.
We can, of course, overrule our decision in Alderwood if we have good reasons for doing so. Indeed, one justice of this court has suggested in her concurring opinion that we do just that, decrying what she describes as this court's "remarkable state constitutional interpretation" in Alderwood. Concurring Op. at 534. Despite the urging of our colleague we are not inclined to overturn Alderwood because the "doctrine [of stare decisis] requires a clear showing that an established rule is incorrect and harmful before it is abandoned." In re Rights to Waters of Stranger Creek, 77 Wash.2d 649, 653, 466 P.2d 508 (1970). Waremart has not met this substantial burden, particularly in light of our decisions which have recognized the importance of protecting the public's access to the initiative process. See, e.g., State ex rel. Booth v. Hinkle, 148 Wash. 445, 451, 269 P. 818 (1928) (stating that the initiative provision in the state constitution should be "preserved and rendered effective"); Alderwood, 96 Wash.2d at 252, 635 P.2d 108 (Dolliver, J., concurring) ("The overriding public interest here involved is to make the initiative process available to all."). The holding in Alderwood, i.e., that citizens may enter commercial property, which is the functional equivalent of a public forum, in order to engage in initiative petitioning, rather than being "incorrect and harmful," effectuates and complies with the express mandate of this court to preserve the people's right to engage in the initiative process. To overturn Alderwood would substantially diminish the ability of Washington's citizens to participate in the initiative process in a meaningful way. We, therefore, reject Waremart's suggestion that we overrule Alderwood.
It is evident from the holding in Alderwood, however, that the right to petition does not extend to all commercial private property which is open to the public. See Alderwood, 96 Wash.2d at 239-40, 635 P.2d 108 ("It is undisputed that gathering initiative signatures in some manner, at some place, is a constitutionally guaranteed practice."); see also Southcenter, 113 Wash.2d at 428-29, 780 P.2d 1282 ("[T]he holding in Alderwood was simply that people have a right under the initiative provision of the Constitution of the State of Washington to solicit signatures for an initiative in a manner that does not violate or unreasonably restrict the rights of private property owners."); Initiative 172 v. Western Wash. Fair Ass'n, 88 Wash.App. 579, 583, 945 P.2d 761 (1997) (stating that the right to gather initiative signatures on certain private property "is limited").
As noted above, in Alderwood we determined that the question of whether Washington's speech and initiative guaranties apply to private conduct must "evolve with each decision" and "involve[s] balancing several factors." In engaging in this balancing, we acknowledge that two of the factors we set forth in Alderwood (i.e., the nature of the speech activity, and the potential for reasonable regulation of the speech) primarily relate to the protection of speech and do not lend themselves well to an analysis of the protections provided by the initiative provision. Two of the factors we identified in Alderwood (i.e., the nature and use of the property, and the impact of the decision upon the effectiveness of the initiative process) do, however, apply well to an analysis of article II, section 1(a). We are also of the view that the factors we identified in Alderwood were not intended to be exclusive. Accordingly, we believe that the related factor of the scope of the invitation that the owner of the property has extended to the public is a relevant consideration.
Progressive strains in its effort to compare the use and nature of Waremart's stores to that of the Alderwood shopping center. The Alderwood shopping center, as we have observed, is a traditional shopping mall "with more than 1,000,000 square feet of store area *531 on 110 acres of land." Alderwood, 96 Wash.2d at 232, 635 P.2d 108. In addition, we noted that the mall contained parking for more than 6,000 automobiles and that impact statements in the record "project 22,000 automobiles entering the mall on an average day in 1978, increasing to 39,600 by 1985." Alderwood, 96 Wash.2d at 232, 635 P.2d 108 (emphasis added).
Waremart's properties are simply not comparable to the Alderwood Mall. Indeed, Progressive concedes that each of the Waremart stores contains only approximately 80,000 square feet of interior space and the parking lot for each store can accommodate only about 600 cars. Opening Br. of Appellant at 25. Moreover, as the trial court found, the public is expressly not invited to enter Waremart's stores for any noncommercial purpose, as is the case with some large regional shopping malls. In that regard, the trial court observed that Waremart's stores "do not promote any public services on their locations nor do they open up areas within their stores to such activities as mall walkers or choir groups" and they do not engage in "mass advertising."[6] CP at 128, 133. Further, as we noted above, the trial court found that in Waremart's stores, "[t]here are no areas for citizens to congregate; no large common areas; nor plaza to sit, wait or converse. In contrast to the mall, there is no intent to provide public services, entertainment or meeting space." CP at 134 (emphasis added). Based on those findings, and the absence of any evidence or findings that Waremart has in the past tolerated activities similar to those which Progressive now seeks to conduct on Waremart's premises, the trial court's conclusion that the "Waremart stores bear none of the characteristics of a town center[,]" is well founded.[7] CP at 130. Progressive is, thus, asking us to extend our holding in Alderwood to include large retail grocery stores, such as Waremart's, which do not extend an invitation to the public to visit its stores for noncommercial purposes and are not the equivalent of a "town square,"[8] "community business block," or other public forum. We are not inclined to do so due to the limited scope of the invitation that Waremart extends to its customers.
We are also persuaded that barring initiative petitioning on Waremart's private property does not seriously undermine the effectiveness of the initiative process due to the fact that, as we have previously noted, Alderwood and Southcenter protect initiative petitioning upon the many commercial properties in the state of Washington which have the earmarks of a town square, downtown area, or other public forum.
Adopting Progressive's position and extending Alderwood to include private property such as Waremart's stores would, in our judgment, constitute an unwarranted extension of our holding in that case. We agree with the trial court that Waremart's stores are basically "the present-day version of the old grocery store" and placing them into the same category as a large regional shopping mall or forum for assembly by the community would be imprudent. CP at 133. While one could argue that Progressive's attempt to extend Alderwood makes sense from a policy standpoint, it does not reflect the current status of the law in Washington. Progressive's *532 argument, therefore, is more properly addressed to the Legislature rather than this court.[9]See State v. Jackson, 137 Wash.2d 712, 725, 976 P.2d 1229 (1999) (stating that a public policy argument, which does not reflect the current status of the law in Washington, "is better addressed to the Legislature"); In re Personal Restraint of Mayner, 107 Wash.2d 512, 519, 730 P.2d 1321 (1986) ("This court has ... cautioned against ... judicial activism in areas of legislative concern."); State v. Smith, 93 Wash.2d 329, 339, 610 P.2d 869 (1980) ("It is not our proper function to substitute our judgment for that of the legislature....").
Finally, we note that our ruling here is consistent with decisions of the appellate courts in Oregon and California. We are of the view that the case law of these states is particularly relevant and persuasive because courts in each of those states have used analysis similar to that used by this court in Alderwood when dealing with analogous issues. See, e.g., State v. Cargill, 100 Or.App. 336, 786 P.2d 208, 214 (1990), aff'd by an equally divided court, 316 Or. 492, 851 P.2d 1141 (1993) (citing Alderwood, 96 Wash.2d 230, 635 P.2d 108); Planned Parenthood v. Wilson, 234 Cal.App.3d 1662, 286 Cal.Rptr. 427, 431-33 (1991) (citing Lopez, 50 Wash.App. 786, 751 P.2d 313). In Lloyd Corp. v. Whiffen, 315 Or. 500, 849 P.2d 446, 453 (1993), the Oregon Supreme Court held that the initiative provision of its state constitution guaranteed initiative petitioners the right to gather signatures in the common areas of large shopping centers, such as the Lloyd Center, subject to reasonable time, place, and manner restrictions. The Oregon court observed, however, that
[t]his opinion does not hold that Article IV, section 1, [the initiative provision of the Oregon constitution,] confers on persons seeking signatures on initiative petitions the right to go on any private property to which the public has been invited. This holding is limited to the facts of this case, which involve the common areas of a large shopping center such as the Lloyd Center:"[[10]]
Lloyd Corp., 849 P.2d at 454 (emphasis added).
In Robins v. Pruneyard Shopping Ctr., 23 Cal.3d 899, 153 Cal.Rptr. 854, 592 P.2d 341, 342-47 (1979), aff'd, 447 U.S. 74, 100 S.Ct. 2035, 64 L.Ed.2d 741 (1980), the California Supreme Court held that a group of students could solicit signatures for a petition at a privately owned shopping center, which contained 65 shops, 10 restaurants, and a cinema, because the property at issue had essentially become a public forum. Several subsequent decisions of the California Court of Appeals indicate, however, that the Robins decision is limited to the context of large regional shopping malls. For example, in Planned Parenthood, 286 Cal.Rptr. at 432, the California Court of Appeals stated that in

Robins, the court recognized that large retail shopping centers today serve as the *533 functional equivalent for the suburban counterpart of the traditional town center business block.... However, the court's contrary language implies that smaller businesses or commercial establishments which do not assume this societal role by public invitation and dedication of private property should not fall within the scope of the Robins rule.
(Emphasis added.) In addition, in Judlo, Inc. v. Vons Cos., 211 Cal.App.3d 1020, 259 Cal.Rptr. 624, 625, 628 (1989), the California Court of Appeals held that a grocery store, which was located in a "shopping center" with about 20 other stores and restaurants, was "not the functional equivalent of a municipality."[11]

IV
In summary, in prior cases we have indicated that when determining whether article II, section 1(a) (amend. 72) of the Washington constitution permits persons to enter the private property of another for purpose of initiative petitioning, a court must balance several factors. Among the useful factors to consider in making this determination are the nature and use of the property, the scope of the invitation that the owner of the private property has extended to the public, and the impact that the case at issue will have on the initiative process.
After balancing these factors, we hold that Progressive does not have a constitutionally protected right under article II, section 1(a) (amend. 72) to enter Waremart's private property to solicit signatures for initiative petitions. We conclude, therefore, that the trial court did not abuse its discretion when it enjoined Progressive and its employees from entering Waremart's stores for the purpose of soliciting initiative petitions. In reaching our decision, we wish to emphasize that we are firm in our view that an owner of private property should generally have the right to determine what lawful activities take place on the privately owned premises. We have, as noted above, recognized a narrow exception to the property owner's sovereignty over the property in favor of the activities of initiative petitioners in cases where the private property on which they seek to gather signatures is a shopping center that bears the earmarks of a town square or public forum. For reasons set forth above, we agree with the trial court that the property in question here does not fall into that category. The property owner's decision to deny the petitioner's entry onto its property for the purpose of conducting this activity does not, therefore, run afoul of the petition gatherers' rights under article II, section 1(a) (amend. 72) of the Washington Constitution.
In light of our holding, we need not reach Waremart's contentions that forcing it to allow Progressive to solicit signatures for an initiative upon its private property would violate its First Amendment rights, and that an extension of the Alderwood holding to encompass its stores would constitute a taking under the Fifth Amendment.
We affirm the trial court's decision in all respects.
GUY, C.J., and SMITH, JOHNSON, TALMADGE, and IRELAND, JJ., concur.
MADSEN, J. (concurring).
I agree with the majority that Progressive Campaigns, Inc. (Progressive) and its agents did not have a right to gather petition signatures for initiatives on Waremart, Inc. (Waremart) property. However, I would reach this result by different reasoning. I would hold that this court has interpreted Const, art. II, § 1(a) (amend. 72) too expansively by allowing one private citizen to enforce action against another.
I would accept Waremart's invitation to overrule "What Is Left of Alderwood." *534 Resp. Br. of Resp't at 13. The majority is correct that the doctrine of stare decisis `"requires a clear showing that an established rule is incorrect and harmful before it is abandoned.'" Majority at 530 (quoting In re Rights to Waters of Stranger Creek, 77 Wash.2d 649, 653, 466 P.2d 508 (1970)). Conversely, however, the principles of judicial decision making demand at least some showing that a rule is correct before it is established. No such showing existed in Alderwood, which makes it easier to abandon. Alderwood Assocs. v. Washington Envtl. Council, 96 Wash.2d 230, 635 P.2d 108 (1981).
In Alderwood, in a nearly analysis-free holding, five justices of this court agreed on two different theories regarding the state constitution allowing for any person to gather signatures for initiative petitions, over the objections of property owners, at large shopping malls such as the Alderwood Mall in Lynnwood, which have become "`the functional equivalent of a downtown area or other public forum.'" Alderwood, 96 Wash.2d at 244, 635 P.2d 108 (quoting Marsh v. Alabama, 326 U.S. 501, 66 S.Ct. 276, 90 L.Ed. 265 (1946)). The four-justice plurality cited no authority whatsoever for this remarkable state constitutional interpretation as it related to its application of the initiative clause, Const. art. II, § 1(a) (amend. 7). Its reasoning, disavowed in Southcenter, was instead focused upon removing the state action component of the free speech clause in Const. art. I, § 5. The plurality's reference to the initiative clause was no more than an aside. See Alderwood, 96 Wash.2d at 244-45, 635 P.2d 108 ("And where the exercise of the speech also involves the initiative process, the activity takes on added constitutional significance.") (citing Sutherland v. Southcenter Shopping Ctr., Inc., 3 Wash.App. 833, 478 P.2d 792 (1970), overruled on other grounds by Southcenter Joint Venture v. National Democratic Policy Comm., 113 Wash.2d 413, 780 P.2d 1282 (1989); PruneYard Shopping Ctr. v. Robins, 447 U.S. 74, 100 S.Ct. 2035, 64 L.Ed.2d 741 (1980)). The only rationale with respect to why state action was not required in applying the initiative clause was supplied by Justice Dolliver's concurrence, which commanded one vote. Waremart is correct that "[t]he plurality did not engage in any separate analysis of Amendment 7.... There is nothing in the plurality opinion that specifically recognizes an independent right to petition on private property under Amendment 7 alone, without the crucial free speech and balancing analysis that was based on Article I, section 5." Resp. Br. of Resp't at 14.
Justice Dolliver's concurrence in Alderwood was pivotal. He disagreed with the plurality's interpretation of the free speech clause but found that under the initiative clause the "overriding" nature of the "public interest ... to make the initiative process available to all" meant that private property rights must yield before that interest. Alderwood, 96 Wash.2d at 252, 635 P.2d 108 (Dolliver, J., concurring). The Washington cases that he cited, however, stood for nothing more substantive than the proposition "that the role created for the people by amendment 7 was closely akin to that of a fourth branch of government." Alderwood, 96 Wash.2d at 252, 635 P.2d 108 (Dolliver, J., concurring). In other words, "the people are part of the apparatus of government  the legislative branch." Alderwood, 96 Wash.2d at 253, 635 P.2d 108 (Dolliver, J., concurring). Even assuming that to be true, it is difficult to understand why this would somehow then guarantee to the people a right not enjoyed by their elected officials, who are also assuredly "part of the apparatus of government"namely the right to trespass upon private property in the face of an express restriction. Id. Certainly if the Alderwood Mall had wanted to prevent the Governor or legislators from drumming up support for legislation on its property it would have been perfectly free to do so.
One of Justice Dolliver's key points was that the "initiative and referendum constitutional and statutory provisions should be liberally construed, to the end that these popular legislative rights of the people should be preserved and rendered effective." Alderwood, 96 Wash.2d at 252, 635 P.2d 108 (Dolliver, J., concurring) (quoting State v. Hinkle, 148 Wash. 445, 451, 269 P. 818 (1928)). The majority in this case mentions this argument and repeats its citation so the context from which it arose is worth looking into. See Majority at 530.
*535 In Hinkle, we cited two cases in which we had "made observations expressing our conviction that these initiative and referendum constitutional and statutory provisions should be liberally construed, to the end that these popular legislative rights of the people should be preserved and rendered effective." Hinkle, 148 Wash. at 451, 269 P. 818 (citing State ex rel. Case v. Superior Court, 81 Wash. 623, 632, 143 P. 461 (1914); State ex rel. Howell v. Superior Court, 97 Wash. 569, 577, 166 P. 1126 (1917)).
In State ex rel. Case,[1] we stated that "it is worthy of note, and that we keep in mind as we proceed, that these initiative and referendum provisions of our constitution are all embodied in one section, which contains these words: `This section is self-executing, but legislation may be enacted especially to facilitate its operation.'" State ex rel. Case, 81 Wash. at 632, 143 P. 461 (emphasis added). We noted that "[i]t was in compliance with this language that the legislature passed the act of 1913 ... declaring, in the title of that act, that it is `to facilitate the operation of the provisions of § 1 of art. 2 of the constitution relating to the initiative and referendum.' Thus there is strongly suggested, in the language of the constitution and this law, a required liberal construction, to the end that this constitutional right of the people may be facilitated, and not hampered by either technical statutory provisions or technical construction thereof...." State ex rel. Case, 81 Wash. at 632, 143 P. 461 (second emphasis added). In other words, it was for the Legislature, and not this court, to build upon the plain language of the initiative clause in order to facilitate its operation, and this court was to liberally construe the Legislature's efforts  and not, as it did in Alderwood, liberally construe the otherwise "self-executing" initiative clause itself so as to add a right not self-evident from its language. This analysis is borne out by the fact that we further wrote in State ex rel. Case, with regard to the then-existing statutory provisions against fraud in the signature gathering process, that "[t]he question being inherently political, the legislature had the right, and evidently intended to provide, these penal provisions as the sole safeguards for the proper operation of the law, except wherein it has specifically provided other safeguards.... Clearly the legislature was not required to go further, and we think it has not done so." State ex rel. Case, 81 Wash. at 646-47, 143 P. 461 (emphasis added). Again, this language is a reflection of the fact that it was for the Legislature to facilitate operation of Const. art. II, § 1(a) (amend. 7).
Alderwood predated our announcement in State v. Gunwall, 106 Wash.2d 54, 63, 720 P.2d 808, 76 A.L.R.4th 517 (1986), that "[r]ecourse to our state constitution as an independent source for recognizing and protecting the individual rights of our citizens must spring not from pure intuition, but from a process that is at once articulable, reasonable and reasoned." However, even before Gunwall, some reasoning was still required to support a new rule of law ostensibly based upon the state constitution. We stated, for example, in interpreting the referendum clause that "[o]ur duty is to find the legislative intent in passing the amendment, and the like intent of the people in adopting it." State ex rel. Blakeslee v. Clausen, 85 Wash. 260, 264, 148 P. 28 (1915). While we thought "the language of the constitution is plain and unambiguous and calls for no construction," we said
[i]n all matters involving an inquiry into political questions, especially so where they relate to a change in accepted forms and fundamental theories, courts must take notice of such changes, the sentiments which sustain them, the reasons urged for or against them, the old condition and the purpose of the change. If it were not so, there could be no rule of construction.
State ex rel. Blakeslee, 85 Wash. at 264, 148 P. 28 (emphasis added).
Here we have no evidence whatsoever that the people intended to effect a radical change in then-existing property rights by adopting Const. art. II, § 1(a) (amend. 7) in 1912. Compare, e.g., Laws of 1909, ch. 249, § 413 *536 (misdemeanor to "wilfully go or remain upon any land after having been warned by the owner or occupant thereof not to trespass thereon ....") with Laws of 1913, ch. 139, § 1 (same language). Indeed, the prospect is quite unimaginable. Justice Stafford, in his Alderwood dissent, noted that Justice Dolliver's "concurrence would, without either analysis or construction of amendment 7, establish a new restriction on property rights. The resulting restriction then would be carved into constitutional granite." Alderwood, 96 Wash.2d at 254, 635 P.2d 108 (Stafford, J., dissenting). Joined by three other justices, he stated that "[c]ourts should not dispense with the inconvenience and cumbersomeness of legislative activity by simply articulating those new constitutional rights they choose to declare." Alderwood, 96 Wash.2d at 254, 635 P.2d 108 (Stafford, J., dissenting). This paraphrased a point that Justice Dolliver, ironically, had made himself in criticizing the plurality's interpretation of the free speech clause: "The majority opinion represents a determination by the court that it, instead of the legislature, will settle conflicting interests among citizens and that it will accomplish this by what it chooses to call a constitutional basis.... Now the court will be able to dispense with the inconvenience and cumbersomeness of legislative activity." Alderwood, 96 Wash.2d at 250, 635 P.2d 108 (Dolliver, J., concurring).
The majority admits that "Southcenter is not directly applicable because article II, section 1(a) (amend. 72) was not at issue in that case." Majority at 529. Southcenter turned solely upon the interpretation of Const. art. I, § 5. Nevertheless, perhaps conscious of the meager underpinnings of Alderwood, which is the only opinion of this court to have found the right that Progressive asserts, the majority attaches great significance to Southcenter throughout its opinion. It concedes that "the application of article II, section 1(a) (amend. 72) was not an issue in Southcenter" but then finds it "worth noting that the mall in that case was a large regional mall, which, unlike Waremart's stores, `maintained a policy of allowing charitable, civic and political groups to use designated `public service centers' within the mall." Majority at 531 n.6 (quoting Southcenter, 113 Wash.2d at 416, 780 P.2d 1282). It is unclear why that point is "worth noting[,]" however, especially since access to that mall by a political organization was disallowed in Southcenter.
The majority also finds it significant that "the majority in Southcenter left `undisturbed the result in Alderwood which recognizes the State's duty to enforce an individual's right to petition on certain private property [i.e., large shopping malls].'" Majority at 529 (quoting Southcenter, 113 Wash.2d at 435, 780 P.2d 1282 (Utter, J., concurring in the result)). This is certainly not significant. The majority in Southcenter could hardly have acted otherwise. As the majority concedes "the applicability of article II, section 1(a) (amend. 72) was not at issue [in Southcenter ]." Majority at 528 n.4 (emphasis added). Consequently, the discussion of the initiative clause in Alderwood was not implicated in Southcenter and, thus, could not have been overruled. Similarly, any language in Southcenter that could be interpreted as expanding upon the Alderwood holding with respect to Const. art. II, § 1(a) (amend. 72) is simply dicta. "In considering... statements made in the course of judicial reasoning, one must remember that general expressions in every opinion are to be confined to the facts then before the court and are to be limited in their relation to the case then decided and to the points actually involved." Peterson v. Hagan, 56 Wash.2d 48, 53, 351 P.2d 127 (1960) (citations omitted); see also State ex rel. Johnson v. Funkhouser, 52 Wash.2d 370, 374, 325 P.2d 297 (1958) ("The issue to which the statement relates was not before the court and, therefore, the statement did not and could not announce our adherence to such a rule.") (citing D'Amico v. Conguista, 24 Wash.2d 674, 683, 167 P.2d 157 (1946)). Yet the majority somehow concludes that both "Alderwood and Southcenter protect initiative petitioning...." Majority at 531. This is simply wrong.
The majority acknowledges that "[w]e can, of course, overrule our decision in Alderwood if we have good reasons for doing so." Majority at 530. However, it says that "[t]o overturn Alderwood would substantially diminish *537 the ability of Washington's citizens to participate in the initiative process in a meaningful way." Majority at 530. It does not say why this is so, nor does it make any effort to quantify the harm it foresees.[2] I would follow Justice Hale's advice:
Better to overrule a case flatly, and say so.... In the long run, a search for distinctions, where there are no real differences, in order to bring a case to a just conclusion, contributes more to uncertainty in the law than does an outright reversal of policy and cancels two of the things upon which the law depends  reason and experience.
State ex rel. Finance Comm. v. Martin, 62 Wash.2d 645, 666, 384 P.2d 833 (1963). Here the majority purports to apply two of the rather amorphous standards from Alderwood; "i.e., the nature and use of the property, and the impact of the decision upon the effectiveness of the initiative process...." Majority at 530. It adds an even more ambiguous factor: "[T]he scope of the invitation that the owner of the property has extended to the public...." Based upon such vague considerations as parking, square feet, and even the absence of "`mall walkers or choir groups[,]'" majority at 531 (quoting Clerk's Papers at 128, 133), the majority distinguishes Alderwood on the basis of the fact that "Waremart's properties are simply not comparable to the Alderwood Mall." Majority at 531.
The significance of the parking and square foot factors appears to be misinterpreted by the majority. The volume of customers at a giant grocery store over the course of a 24-hour business day as compared to those at a mall  given their comparatively shorter stays and, thus, higher turnover of parking spaces  rivals that found at a mall. From the standpoint of a signature gatherer  and "the effectiveness of the initiative process"  there could hardly be a more ideal or efficient spot to conduct one's business than the single entrance and exit of a grocery store. Majority at 531. Unlike the foot traffic passing by a card table set up within a vast mall, such as that found in Alderwood, all customers (i.e., prospective petition signers) at a grocery store are sure to pass a well-positioned signature gatherer. There are numerous entrances and exits to a mall and its businesses, and one could easily visit a mall without ever entering the common area where signature gathering might occur. Cf. Opening Br. of Appellant at 13 (Progressive argues that "[t]he best locations for finding... high traffic volumes are large grocery stores, discount stores, and drug stores.... [L]arge regional malls are not good locations for signature gathering." (emphasis added) (citations omitted)). Thus, some of the majority's key distinctions are without a difference, see State ex rel. Finance Comm., 62 Wash.2d at 666, 384 P.2d 833, and it has effectively abandoned the two Alderwood factors it sets out to apply. Moreover, the likely effect of the majority's new "scope of the invitation" factor will be to chill civility by ensuring that Waremart and similar businesses think twice about risking "public forum" status by ever inviting the public to enter their stores "for any noncommercial purpose." Majority at 531.
We must be careful not be overcome by idealism about what is at stake here. One extraordinary by-product of the majority's decision to preserve what remains of Alderwood is that private property owners will be forced to allow signature gatherers who are paid per signature to engage in commerce upon their property. Progressive, the petitioner in this case, is a "profit-making California corporation." Majority at 525. It qualified four initiatives for the Washington ballot in a two-year period of time. Enriching out-of-state corporations is, thus, another benefit to reaffirming Alderwood that the majority could mention.
It is ironic and highlights the flaw in the majority's reasoning that this court has rejected a constitutional challenge to a Washington statute declaring that "paying a worker, whose task it is to secure the signatures of voters on initiative or referendum petitions, *538 on the basis of the number of signatures the worker secures on the petitions encourages the introduction of fraud in the signature gathering process." RCW 29.79.500. The law notes that "[s]uch payments also threaten the integrity of the initiative and referendum process by providing an incentive for misrepresenting the nature or effect of a ballot measure in securing petition signatures for the measure." Id. Imposition of criminal penalties for violation of this law, the substance of which dated back to 1913, see Laws of 1913, ch. 138, § 32, has been deemed constitutional by this court. See State v. Conifer Enters., Inc., 82 Wash.2d 94, 98, 508 P.2d 149 (1973) ("It is reasonably conceivable that persons who solicit signatures for pay  not for principle's sake  may adopt measures, employ tactics and assert pressures inconsistent with a free and uncorrupted exercise of the right of initiative."). Under the majority's position today, would not Conifer Enters, have "substantially diminish[ed] the ability of Washington's citizens to participate in the initiative process in a meaningful way"? Majority at 530. Yet, the penalty provided by RCW 29.79.490(2), somehow easily passed muster under the initiative clause that we now find to be so sweeping in its effect.[3]
In conclusion, we should recognize Alderwood for what it is: an anomalous ruling on two different theories neither of which commanded a clear majority, let alone articulate any clear, persuasive reasoning. Southcenter, in turn, could not have overruled the reasoning, such as it was, in Alderwood with respect to Const. art. II, § 1(a) (amend. 7) because it did not implicate that provision, reserving that question for another day. That day has now arrived. I would apply the reasoning of Southcenter concerning Const. art. I, § 5 to Const. art. II, § 1(a) (amend. 72) because this reasoning cannot be fairly distinguished: "[T]he fundamental nature of a constitution is to govern the relationship between the people and their government, not to control the rights of the people vis-a-vis each other." Southcenter, 113 Wash.2d at 422, 780 P.2d 1282 (emphasis added). In Southcenter, we noted that "[w]ere we to assume the role of weighing competing constitutional interests asserted between private parties ... we would be violating the separation of powers ... by arrogating to the judicial branch of government powers that properly reside with the legislative branch of government." Southcenter, 113 Wash.2d at 426, 780 P.2d 1282. We stated that "this court is not at liberty to disregard the fundamental nature of our constitution in order to advance theories that may be perceived by some to constitute desirable social policy." Southcenter, 113 Wash.2d at 429-30, 780 P.2d 1282. Finally, in a blow to the new analytical factor that the majority employs in this case, we wrote that under our state constitution we "agree with the United States Supreme Court ... that `property [does not] lose its private character merely because the public is generally invited to use it for designated purposes.'" Southcenter, 113 Wash.2d at 433, 780 P.2d 1282 (alteration in original) (quoting Lloyd Corp., Ltd. v. Tanner, 407 U.S. 551, 569, 92 S.Ct. 2219, 33 L.Ed.2d 131 (1972)). After all, if "public invitation and size were the relevant criteria, it could well be asked how shopping centers could be legally distinguished from places such as sport stadiums, convention halls, theaters, county and state fairs, large office and apartment buildings, supermarkets, department stores or churches." Southcenter, 113 Wash.2d at 433, 780 P.2d 1282 (emphasis added).
Southcenter did not provide the vehicle for overruling Alderwood. This case does. We should seize the opportunity.
SANDERS, J. (dissenting).
The majority looks for a shopping mall but cannot find one. I look to the state constitution, which mandates, "[t]he people reserve to themselves the power to propose bills, laws, and to enact or reject the same at the polls" and "[t]he first power reserved by the people is the initiative." Const. art. II, § 1(a) (amend. 72).[1]
*539 While the majority inveighs against "`judicial activism in areas of legislative concern,'" Majority at 532 (quoting In re Personal Restraint of Mayner, 107 Wash.2d 512, 519, 730 P.2d 1321 (1986)), our concern is the state constitution, not the legislature. Rather, I posit, the restraint this court must observe is that expressed by the constitutional text and the fundamental principles which it animates, not a subjective "balancing" of irrelevant factors. Cf. Const. art. I, § 29 ("The provisions of this Constitution are mandatory, unless by express words they are declared to be otherwise."); art. I, § 32 ("A frequent recurrence to fundamental principles is essential to the security of individual right and the perpetuity of free government."). The words of the constitution must be afforded their common and ordinary meaning as popularly understood upon ratification. State ex rel. O'Connell v. Slavin, 75 Wash.2d 554, 557, 452 P.2d 943 (1969); Robert F. Utter, Freedom and Diversity in a Federal System: Perspectives on State Constitutions and the Washington Declaration of Rights, 7 U. Puget Sound L.Rev. 491 509 (1984). It is not the role of the court to engraft exceptions in the constitutional provisions where none are expressed, no matter how desirable or expedient such exceptions might seem. State ex rel. O'Connell v. Port of Seattle, 65 Wash.2d 801, 806, 399 P.2d 623 (1965).
The ultimate question to be answered in this proceeding is therefore the same as that addressed in Alderwood Assocs. v. Washington Envtl. Council, 96 Wash.2d 230, 635 P.2d 108 (1981): Does the Washington Constitution article II, section 1 (amend. 72), privilege private citizens to collect initiative-petition signatures on private property? As five members of this court unmistakably answered the aforementioned question affirmatively in Alderwood, we must now decide whether we are going to overrule Alderwood or, if not, whether our constitution provides a principled basis to confine initiative signature-gatherers merely to shopping malls.
As to the first questionwhether we should overrule Alderwood and, by so doing, hold that constitution article II, section 1 (amend. 72) does not grant a right to private persons to enter private property to gather initiative signaturesWaremart devotes a majority of its brief and argument. Waremart's is a constitutionally principled argumentas is Progressive's response. However notwithstanding the cobbled majority in Alderwood, and the subsequent rejection of Alderwood's free speech rationale in Southcenter Joint Venture v. National Democratic Policy Comm., 113 Wash.2d 413, 780 P.2d 1282 (1989), the majority refuses to substantively reconsider the right to solicit initiative signatures on private property because "[t]o overturn Alderwood would substantially diminish the ability of Washington's citizens to participate in the initiative process in a meaningful way." Majority at 530. So be it.
Therefore the first propositionthat the Washington Constitution guarantees a right to collect initiative signatures on private propertyis proved, given there are not five votes to undo it.
The next question is therefore whether the Washington Constitution limits the exercise of that right to shopping malls. The majority says yes. However, the majority's is a curious result since there were no privately owned shopping malls in the state of Washington when this constitutional amendment was ratified in 1912, and there is neither word nor phrase in the constitutional text which suggests any limitation of that kind. Indeed, if it is our view that constitution article II, section 1 (amend. 72), grants a right to trespass on private property to obtain initiative signatures so as not to "substantially diminish the ability of Washington's citizens to participate in the initiative process in a meaningful way," Majority at 530, then it would seem equally "meaningful" for the signature-gatherer to ply his trade wherever potential signatores are present. As the majority tells us Waremart attracts approximately 30,000 customers weekly there exists an ample and rational incentive for Progressive to be present as well.
*540 Although it might be argued such activities could be reasonably subject to time, place, and manner limitations, that is not the question before us nor is it the question the majority decides. Although Progressive has indicated a willingness to abide by reasonable conditions of that nature, it is the position of Waremart, and of the majority of this court, that no initiative signature solicitation need be permitted on this property at any time, in any manner, under any conditions, as a matter of constitutional principle. Apparently the majority divines this principlewhich distinguishes shopping mall islands from the sea that surrounds themnot from the constitutional text but from that portion of the plurality opinion in Alderwood which we subsequently rejected in Southcenter.
In Alderwood an environmental group asserted it had the right to solicit signatures for an initiative at a regional shopping center. A four member pluralityi.e., less than a majority of the courtfound both article I, section 5, and article II, section 1 (amend. 7), of the state constitution protected the right of initiative petitioners to gather signatures upon the private property of the Alderwood shopping mall.[2]Alderwood Assocs., 96 Wash.2d at 239, 635 P.2d 108. Because the plurality concluded article I, section 5, and article II, section 1 (amend. 7), did not require "state action," it engaged in a novel "balancing" approach to determine when these constitutional guaranties apply to private conduct. Alderwood Assocs., 96 Wash.2d at 244, 635 P.2d 108. The plurality concluded, "Since the balance favors the speech and initiative activity, section 5 and amendment 7 are applicable." Id. at 246, 635 P.2d 108.
Justice Dolliver concurred in the result of the majority but sharply criticized its reasoning, nevertheless agreeing "that the activity involved in this case was a reasonable restriction on the use of the Alderwood Mall by plaintiff and was not of such a nature as to constitute an uncompensated `taking' of private property." Id. at 251, 635 P.2d 108 (Dolliver, J., concurring) (citing PruneYard Shopping Ctr. v. Robins, 447 U.S. 74, 81, 100 S.Ct. 2035, 64 L.Ed.2d 741 (1980)). But Justice Dolliver refused to adopt the balancing approach followed by the plurality. "Rather than emasculate the state action requirement from the Declaration of Rights, however, I would hold that the activity engaged in here by the defendants is authorized by Const. art. 2, § 1(a) (amendment 7), RCW 29.79, and the cases decided by this court." Alderwood Assocs., 96 Wash.2d at 251, 635 P.2d 108 (citing State ex rel. Evich v. Superior Court, 188 Wash. 19, 61 P.2d 143 (1936); State ex rel. Case v. Superior Court, 81 Wash. 623, 143 P. 461 (1914)).
Unlike the Alderwood plurality, Justice Dolliver did not purport to balance the rights of initiative petitioners against those of private property owners. Rather, Justice Dolliver unequivocally stated, "Implicit in the initiative process is the need to gather signatures in a manner which does not violate or unreasonably restrict the rights of private property owners." Alderwood Assocs., 96 Wash.2d at 253, 635 P.2d 108.[3] Thus, the majority here inaccurately concludes the five justice majority in Alderwood agreed article II, section 1 (amend. 7), protects petitioners who gather signatures only "at large shopping malls, such as the Alderwood Mall, which have become `the functional equivalent of a downtown area or other public forum.'" Majority at 528 (citing Alderwood Assocs., 96 Wash.2d at 244, 635 P.2d 108).
*541 Unlike the majority here, we accurately restated Alderwood`s holding in Southcenter, 113 Wash.2d at 428-29, 780 P.2d 1282 (Dolliver, J., concurring) (citing Alderwood Assocs., 96 Wash.2d at 253, 635 P.2d 108):
[T]he holding in Alderwood was simply that people have a right under the initiative provision of the Constitution of the State of Washington to solicit signatures for an initiative in a manner that does not violate or unreasonably restrict the rights of private property owners. We expressly do not here disturb that holding.
(Footnote omitted.) Notably, the Southcenter majority did not limit Alderwood`s holding to petitioning activity "at large shopping malls," nor did it characterize the rights reserved by the people under article II, section 1 (amend. 72), as subject to some sort of balancing test.[4] Thus, the application of a balancing test to limit the reach of article II, section 1, to large shopping malls is utterly without support in our precedent, an invention of the majority sewn from whole cloth.
Even if this fabricated balancing test found support in our precedent, the logic relied upon by the majority to balance the rights of private property owners against petitioners is inapplicable and has long been rejected. Relying exclusively on Alderwood, the majority purportedly applies three factors to determine whether petitioner's conduct here is protected: (1) the nature and use of the property, (2) the scope of the invitation extended to the public by the property owner, and (3) the impact of the decision upon the initiative process. Majority at 530. Clearly determinative, however, is the majority's assessment that "`Waremart stores bear none of the characteristics of a town center,'" "are not the equivalent of a `town square,' `community business block,' or other public forum," and do not "have the earmarks of a town square, downtown area, or other public forum." Majority at 531-532.
The search for a "town square" or "business block" began not in our state constitutional jurisprudence but in Amalgamated Food Employees Local 590 v. Logan Valley Plaza, Inc., 391 U.S. 308, 88 S.Ct. 1601, 20 L.Ed.2d 603 (1968). The issue there was whether state trespass laws could be applied to union members picketing a large, nonunion supermarket located in a shopping center. Citing Marsh v. Alabama, 326 U.S. 501, 66 S.Ct. 276, 90 L.Ed. 265 (1946), the Supreme Court stated in Logan Valley:
We see no reason why access to a business district in a company town for the purpose of exercising First Amendment rights should be constitutionally required, while access for the same purpose to property functioning as a business district should be limited simply because the property surrounding the `business district' is not under the same ownership.
Logan Valley, 391 U.S. at 319, 88 S.Ct. 1601. The Supreme Court thus concluded this functional equivalency called for the same result obtained in Marsh the picketers were entitled "to exercise their First Amendment rights on the premises in a manner and for a purpose generally consonant with the use to which the property is actually put." Id. at 319-20, 88 S.Ct. 1601.
However the "functional equivalent" language of Logan Valley was short lived, as the Supreme Court made clear in Lloyd Corp. v. Tanner, 407 U.S. 551, 92 S.Ct. 2219, 33 L.Ed.2d 131 (1972). There the Court held that in focusing on whether Lloyd Center was "the functional equivalent of a public business district," the lower courts had missed the mark.
The courts below considered the critical inquiry to be whether Lloyd Center was "the functional equivalent of a public business district." This phrase was first used in Logan Valley, but its genesis was in Marsh .... The Court [in Marsh] simply held that where private interests were substituting for and performing the customary functions of government, First Amendment *542 freedoms could not be denied where exercised in the customary manner on the town's sidewalks and streets.
Lloyd Corp., 407 U.S. at 561-62, 92 S.Ct. 2219 (footnote omitted). In Hudgens v. NLRB, 424 U.S. 507, 96 S.Ct. 1029, 47 L.Ed.2d 196 (1976), the Supreme Court held a shopping center could ban the picketing of one of its stores. The Court explained that its decision in Lloyd effectively overruled the rationale of Logan Valley, which suggested a large self-contained shopping center is the functional equivalent of a municipality. Id. at 518-21, 96 S.Ct. 1029.
In Southcenter, like the United States Supreme Court, we explicitly rejected the "functional equivalent" or "public function" rationale where we explained:
Based on Lloyd, therefore, it is obvious in the case before us that the "public function" doctrine is inapposite under the Constitution of the United States. Nor do we perceive any persuasive reason why this doctrine should apply any differently under our state constitution. It simply cannot reasonably be said that a shopping mall performs the functions traditionally and exclusively reserved to the state.
Southcenter, 113 Wash.2d at 432, 780 P.2d 1282. Further, this rationale was developedand eventually rejectedin the context of determining the scope of First Amendment rights. Because the instant case involves the initiative provision of the Washington Constitution, First Amendment jurisprudence is wholly inapplicable. See Alderwood Assocs., 96 Wash.2d at 253, 635 P.2d 108 (Dolliver, J., concurring) (article II, section 1 (amend. 7), is not a right against government in the sense of article I, § 5, but is instead a declaration that the people are part of the legislative process).

CONCLUSION
The majority creatively reconstructs our precedent to manufacture its own preferred balance between the rights of private property owners and the rights of initiative petitioners. However, "this court is not at liberty to disregard the fundamental nature of our constitution in order to advance theories that may be perceived by some to constitute desirable social policy." Southcenter, 113 Wash.2d at 429-30, 780 P.2d 1282 (citation omitted). Because the majority ignores the plain language of article II, section 1 (amend. 72), and fabricates a balancing test based on long rejected logic, not constitutional principle, I dissent.
NOTES
[1] The record indicates that the range of products that Waremart's stores sell are the same kinds of items that you could "buy at a typical Safeway or Albertson's" store. RP at 186.
[2] In Alderwood, we noted that "the first amendment to the United States Constitution does not require shopping malls to tolerate the signature practice." Alderwood, 96 Wash.2d at 240, 635 P.2d 108 (citing Hudgens v. NLRB, 424 U.S. 507, 96 S.Ct. 1029, 47 L.Ed.2d 196 (1976); Lloyd Corp. v. Tanner, 407 U.S. 551, 92 S.Ct. 2219, 33 L.Ed.2d 131 (1972)).
[3] Article I, section 5 of Washington's constitution provides that "[e]very person may freely speak, write and publish on all subjects, being responsible for the abuse of that right."
[4] In Southcenter, the applicability of article II, section 1 (a) (amend. 72) was not at issue.
[5] In regard to the trial court's findings that described the physical features of Waremart's properties. Progressive has assigned error only to the trial court's finding that the sidewalks bordering Waremart's stores are "narrow." Opening Br. of Appellant at 2.
[6] Although the application of the article II, section 1(a) (amend.72) was not an issue in Southcenter, it is worth noting that the mall in that case was a large regional mall, which, unlike Waremart's stores, "maintained a policy of allowing charitable, civic and political groups to use designated `public service centers' within the mall." Southcenter, 113 Wash.2d at 416, 780 P.2d 1282.
[7] It is noteworthy that the United States Supreme Court appears to agree with this conclusion because in Lloyd Corp. v. Tanner, 407 U.S. 551, 569, 92 S.Ct. 2219, 33 L.Ed.2d 131 (1972), it stated that "[n]or does property lose its private character merely because the public is generally invited to use it for designated purposes. Few would argue that a free-standing store, with abutting parking space for customers, assumes significant public attributes merely because the public is invited to shop there."
[8] Progressive asserts that the "trial court ... erred by applying the `town square' paradigm" and that it should have applied the "business block paradigm." Opening Br. of Appellant at 20. This argument is meritless and dwells on a distinction without a difference because there is no indication from this court's opinion in Alderwood or Southcenter that there is a difference between the "town square" and "business block" paradigms.
[9] Our conclusion that article II, section 1(a) (amend. 72) does not grant initiative petitioners the right to gather signatures on Waremart's property is furthered by the fact that there are no published cases in Washington that require the owner of private property, other than a large shopping mall, to allow initiative petitioners to solicit signatures upon their property. It is worth noting, however, that the Court of Appeals, in City of Sunnyside v. Lopez, 50 Wash.App. 786, 794, 751 P.2d 313 (1988), did, albeit while relying on the now overruled free speech portion of Alderwood, hold that a business complex, which was situated on an acre and a half of land and had 110 parking spaces, "was not the functional equivalent a public place." This case, while not directly on point, benefits Waremart to a certain extent because its stores certainly resemble this complex, in terms of their size and function, to a much closer degree than they do a large shopping mall like Alderwood or Southcenter.
[10] Significantly, in a similar lawsuit involving Waremart's stores in Oregon, a trial court in Oregon issued a declaratory judgment in which it determined that "plaintiff's Cub Foods and Waremart stores in Oregon are not forums for assembly by the community where individuals have a constitutionally protected right to engage in initiative petitioning and consequently plaintiff has a legally enforceable right to remove individuals from inside the Cub Foods store and its adjoining sidewalk at the Beaverton Mall, and from the inside of all other Cub Foods and Waremart stores in Oregon and from their adjoining sidewalks and parking lots, if they enter or remain on those premises for the purpose of soliciting signatures on initiative or referendum petitions." Resp. Br. of Resp't at app. 14 (emphasis added).
[11] In addition, we note that a trial court in California, in a suit similar to the one here, entered a judgment in favor of Waremart, concluding that "[b]ecause [Waremart's] premises are not the functional equivalent of [a] municipality or public forum, plaintiff has the legally enforceable right to prevent persons from entering or remaining on plaintiff's premises for purposes that are outside the scope of plaintiff's invitation to the public" and that, as a result, Waremart "has a legally enforceable right to prevent defendant VOTER REVOLT from entering, or remaining, on [its] premises for the purpose of soliciting persons to sign initiative petitions." Resp. Br. of Resp't at app. 16.
[1] State ex rel. Howell v. Superior Court, 97 Wash. 569, 577-78, 166 P. 1126 (1917) just repeats language from State ex rel. Case v. Superior Court, 81 Wash. 623, 143 P. 461 (1914) without adding to it in any meaningful way.
[2] Qualifying an initiative for the ballot is not constitutionally required to be an effortless process. See, e.g., Const. art. II, § 1(a) (amend.72) (requiring that the number of valid signatures of legal voters on a petition "shall be equal to eight percent of the votes cast for the office of governor at the last gubernatorial election preceding the initial filing of the text of the initiative measure with the secretary of state.").
[3] This statute was recently declared unconstitutional under the First Amendment by the United States District Court in LIMIT v. Maleng, 874 F.Supp. 1138 (W.D.Wash.1994).
[1] The current version of constitution article II, section 1 is amendment 72, approved in 1981. The 1912-1981 version of article II, section 1 was amendment 7.
[2] The majority here states "a four member plurality held that article I, section 5... and article II, section 1(a) ... protected the right of initiative petitioners...." Majority at 527. The majority's characterization of the plurality's decision as a holding indicates the apparent weight given to this decision.
[3] In fact, the Alderwood dissent acknowledged Justice Dolliver's opinion granted initiative petitioners virtually unimpeded access to private property. "I disagree with the use, by the concurrence, of Const. art. 2, § 1(a) (amendment 7) to establish a new constitutional right which authorizes persons gathering signatures on initiative petitions to go onto private property and which leaves owners of private property powerless to exclude them." Alderwood, 96 Wash.2d at 253, 635 P.2d 108 (Stafford, J., dissenting).
[4] The majority attaches great significance to Justice Utter's observation that the Southcenter majority left "undisturbed the result in Alderwood which recognizes the State's duty to enforce an individual's right to petition on certain private property." Southcenter, 113 Wash.2d at 435, 780 P.2d 1282 (Utter, J., concurring in result). Regardless of whatever weight is given to this passing observation, it is clear Justice Utter did not attempt to restate the holding of Alderwood and further did not limit its holding to simply "large shopping malls." See Majority at 529.